Carl OTTO, Plaintiff,

v.

KOPPERS COMPANY, Inc., a Delaware corporation, and Wheeling Steel Corporation, a Delaware corporation, Defendants.

No. 655–W.

United States District Court
N. D. West Virginia, Wheeling Division.
Dec. 28, 1956.

O'Brien & O'Brien, Wheeling, W. Va., Pennie, Edmonds, Morton, Barrows & Taylor, and John E. Hubbell, New York City, for plaintiff.

Schmidt, Hugus & Laas, Wheeling, W. Va., and Brown, Critchlow, Flick & Peckham, Pittsburgh, Pa., for defendants.

BOREMAN, District Judge.

This is an action for patent infringement, involving two patents owned by the plaintiff, Dr. Carl Otto (hereinafter sometimes referred to as "Otto"), who is a citizen of the State of New York, an engineer, and the head of Otto Construction Company, a New York firm engaged in the design and erection of by-product coke oven plants. Defendant, Koppers Company, Inc., a Delaware corporation (hereinafter sometimes referred to as

"Koppers")', has principal offices in Pittsburgh, Pennsylvania, is licensed to do business in West Virginia, and is also engaged in the design and erection of by-product coke oven plants. Defendant, Wheeling Steel Corporation, a Delaware corporation (hereinafter sometimes referred to as "Wheeling"), owns and operates a plant at Follansbee, in the Northern District of West Virginia, where apparatus and processes charged to infringe both Otto patents, have been built and operated.

The original complaint charged infringement of Otto's U.S.Patent No. 2,-599,067 which discloses and claims method and apparatus for the production of ammonium sulphate as a by-product from coke oven gas by means of a "spray" type saturator. After answer by Koppers and Wheeling challenging validity of the claims of the patent and denying infringement, Otto served on Koppers a number of interrogatories, to some of which Koppers objected. This Court ruled on these objections, requiring answers to some and sustaining objections to others. Based upon information thus obtained by Otto through interrogatories, an amended complaint was filed expanding the original complaint to include an additional charge that the defendants had infringed an earlier Otto U.S.Patent No. 2,423,794, which discloses and claims apparatus and process for production of ammonium sulphate as a by-product from coke oven gas by means of a special "flare mouth" type dip pipe saturator. The defendants answered this amended complaint denying infringement of the additional patent as well, asserting that its claims were also invalid, and specifying the particular prior art upon which defendants would rely to sustain their charge of invalidity as to both patents.

In considering Koppers' objections to interrogatories prior to the filing of Otto's amended complaint, it became necessary to determine the territorial scope of proof of alleged acts of infringement of Patent No. 2,599,067 and this Court's decision on that question is reported in

Otto v. Koppers Company and Wheeling Steel Corporation, 134 Fed.Supp. 886. By the effect of said decision, evidence of infringement as to both patents is limited to structures built and processes used by these defendants in the Northern District of West Virginia.

Explanation of the subject matter of the two Otto patents here involved appears to be necessary. The gas produced from the coke manufacturing process contains ammonia in substantial quantities. For certain reasons, it is desirable, or even necessary, to remove the ammonia from the coke oven gas before the gas can be properly and safely utilized. Over the years, the by-product coke oven industry has faced the problem of removing the ammonia from the gas and at the same time obtaining a by-product disposable to economic advantage.

The generally accepted solution of this problem has been to bring the coke oven gas containing the ammonia into contact with a liquor containing sulphuric acid so that a reaction occurs between the ammonia and sulphuric acid, thus producing marketable ammonium sulphate.

For years, most of the by-product ammonium sulphate in this country was produced in saturators in which the gas was bubbled through a bath of liquor containing sulphuric acid. This bath consisted of an acidified saturated solution of ammonium sulphate containing solid crystals of ammonium sulphate, and the effect of the ammonia reacting with the acid was to produce, directly in the bath, more crystalline sulphate. Crystals were periodically withdrawn and acid replaced to enable the process to proceed substantially continuously. Because some solid salt was constantly being deposited on the apparatus itself, it was necessary periodically to "kill" the bath, or to so dilute the bath with water and acid that such deposits would dissolve. The "kill" did not interrupt the removal of ammonia from the gas which continued to flow and the acid-ammonia reaction continued, but under such conditions of dilution that no crys-

tal formation could take place. The pipe through which the gas passed into the liquor in this conventional apparatus was called a "crackerpipe" and usually dipped some twenty-five to thirty-eight inches into the liquor bath. The result was that the gas had to be forced or pumped against a high pressure head in order for it to pass through the crackerpipe against the seal of the liquor bath.

It seems to be undisputed that the early saturators, known as the crackerpipe type, were satisfactory when installed, removed a high percentage of the ammonia from the gas and apparently continued to be satisfactory for many years. The true background history appears to be that soon after 1939, the problem of handling more coke oven gas became acute because the steel industry was putting in more coke ovens. The problem which Dr. Otto sought to solve arose soon after he came to this country in 1939 and he stated this problem as follows: "The problem was that it was the trend of the times, by-product plants were getting too small for the gas output * * *. Therefore, it was important to design apparatus which could take care of the conditions to get bigger output through the by-product plants, resulting in remodeling the old by-product plant." (Trans. page 160).

It was only natural that the producing companies should try to keep the cost of producing ammonium sulphate as low as possible, and it follows that a reduction in the high pressure head would reduce the power cost of pumping the gas through the liquor bath in the saturator.

While both patents in suit relate to ammonia saturators and the incidental production of ammonium sulphate crystals, each patent describes and claims different saturator apparatus and different methods of operation. The respective defenses to the charges of infringement of the two patents involve different prior art, different issues of patentability and different issues of infringement. Therefore, each patent, the claim of infringement and the defense thereto will be separately considered.

### U. S. Patent No. 2,423,794
### (Otto Flare-Mouth)

The application for this patent was filed on August 25, 1943, and patent was issued on July 8, 1947. The original application contained sixteen claims, all of which were subsequently canceled. Claim 1 was a broad method claim and Claim 7 was a broad apparatus claim. These claims attempted to cover broadly the idea of passing the gas "in a generally horizontal direction" between "an upper wall surface" and the surface of the liquor bath. These broad claims were not limited to a flare-mouth but were drawn to include a form in which there was no central crackerpipe but a peripheral type of crackerpipe, broad enough to cover any angle of the "upper wall surface" and were not even clearly limited to having this surface slope downwardly.

All of the sixteen original claims were rejected as being substantially met by a number of prior art references. There followed an extensive interchange between the Patent Office Examiner and Otto's attorney which resulted in an Official Action of October 29, 1946, in which the Examiner made "final" his rejection of the broad claims, but suggested that he would allow a single claim which is identical with Claim 1 of this patent, as hereinafter set forth.

The allowance of this claim was preceded by several interviews between Otto's attorney and the Examiner, but there is no record in the file history of the arguments which persuaded the Examiner to allow Claims 1, 2 and 3, as contained in the patent. The defendants call attention to Rule 133 of the Rules of Practice of the Patent Office, which requires that "a complete written statement of the reasons presented at the interview warranting a favorable action must be filed by the applicant".

The plaintiff's amended complaint charges that defendant Koppers has, since July 1947 and within six years, infringed Patent No. 2,423,794 by, without authority from Otto or his predecessor in title, using coke oven apparatus

embodying the patented invention, using methods embracing the patented invention for the continuous production of sulphate of ammonia, and actively inducing others, including Wheeling, to use said apparatus and methods of the patented invention. Said amended complaint charges that the defendant Wheeling, since July 1947 and within six years, infringed said patent by, without authority from Otto or his predecessor in title, using by-product coke oven apparatus embodying the patented invention made for it by Koppers, and using methods embracing the patented invention for the continuous production of sulphate of· ammonia.

This patent contains three claims but, from the record, the plaintiff's arguments and briefs, it is apparent that plaintiff's counsel is not relying upon alleged infringement by these defendants of Claim 2, but only Claims 1 and 3 of the patent. These claims are quoted as follows:

"1. A saturator for producing ammonium sulphate comprising in combination an enclosed tank, an overflow outlet in the wall of said tank for establishing and maintaining the level of liquor therein, a crackerpipe having a lower vertical portion centrally disposed in said tank and having an outwardly downwardly flared mouth at its lower end, the rim of said flare mouth being at a level slightly below the overflow level and the flared portion having a downward slope from the crackerpipe toward the rim of from 4° to 15° to the horizontal."

"3. In a process for producing ammonium sulfate which comprises passing ammonia-containing gas into contact with a bath liquor containing sulfuric acid, the improvement which consists in passing the gas beneath a surface which slopes downwardly, from the point at which it is brought in, at an angle of 4° to 15° to the horizontal, the lower edge of said surface being below the normal liquid level, so that the liquid surface beneath the sloping surface is depressed and agitated by said gas, the rate of gas flow being in excess of two

cubic feet per second per inch of length of the discharge edge of said surface."

This patent, which has been referred to as the "flare-mouth" and at the trial and in the briefs referred to as the "bellmouth", discloses three different forms of apparatus, the first in Figures 1 to 6, the second in Figures 9 and 10, and the third in Figures 11 and 12. The patent goes into great detail in describing these three forms, and devotes much space to the explanation of features admitted to be old, such as the flushing of the walls of the saturator and the recirculation of the liquor in the crystallizing chamber at the bottom of the saturator. But the patent itself admits that almost everything shown is old, and that the only novelty claimed relates to the "form and disposition of the means for passing the incoming gas into scrubbing contact with the bath liquor". In other words, the only claim to novelty relates to the flare-mouth at the lower end of the crackerpipe.

In describing how he came to make the invention disclosed in this patent, plaintiff Otto said in his testimony at the trial that "the old-type crackerpipe saturator made the gas bubble through the liquor in a vertical direction" and that he wanted "to go over from the vertical flow to the horizontal flow". He stated: "My purpose was really to make it flow horizontally and contact the liquor".

The original file wrapper discloses amendment after amendment presented by the plaintiff, Dr. Otto, through his attorney, after the Examiner had criticized the application and indicated a rejection of all claims. The final suggestion of the Examiner of the allowance of one claim was adopted, which suggested claim was carried into the patent as Claim 1.

An examination of the file wrapper discloses that a desperate effort was made by plaintiff's attorney to add to the original specifications, by providing that the submerged lower peripheral edge of the outwardly flared discharge mouth should have a radial extent not

less than 65% of the radial extent of the tank, in substantially all directions from the tank axis. It was argued by plaintiff's attorney that "the advantage is believed by the applicant to be due to the damping effect on the bath liquor surging movement of the resistance to flow through the relatively small angular space between the mouth piece discharge edge and the tank wall through which the bath liquor must move up and down as surging occurs. The newly directed claim 18 is directed to the feature just referred to. None of the references disclose anything of the sort. The difference in mouthpiece lip and tank diameters specified in new claim 18, marks no mere change in degree from the prior art. The dimensions specified in claim 18 insure an effective damping opposition to surging movement of the bath liquor, and no such damping action is obtainable with apparatus constructed in accordance with the regular practice of the prior art, because of the much smaller crackerpipe mouthpiece diameter relative to tank diameter". As shown before, the Examiner disallowed this new claim, as well as all other original claims.

Figure 8 of the patent is a graph which purports to represent the "degree of incline" in relation to the "gas flow in cubic feet per min.", showing the "line of light ripples", the "line of strong ripples", and the "line of surge". The original application stated: "While it is essential to the full attainment of the advantages of the invention that the direction of gas flow through the free gas space of the scrubbing zone should be approximately horizontal, I have found it practically desirable to incline the wall surface forming the roof of said gas space at a small angle to the horizontal with the lower edge of said wall surface at the gas discharge edge of said space. Said angle which may vary from a minimum of four or five degrees to a maximum not greater than fifteen degrees. Unless the wall forming the roof of the free gas space is so inclined, gas flow conditions and bath liquor surging actions may occur which will materially interfere with the efficiency of the scrubbing action, and which tend to cause objectionable deposits of sulphate of ammonia crystal or 'salt' on said wall." In the original application, Figure 8 is described as "a chart illustrating test apparatus results obtained with different rates of gas flow and with different roof inclinations".

At the bottom of page 13 and following on page 14 of the specifications as contained in the original application, we find the following: "As a result of studies and tests made by me, I believe that the under surface of the mouthpiece lip * * * or analogous gas space roof or top wall should incline downwardly toward the discharge end of the gas space generally * * *. As stated above, the inclination to the horizontal of the under surface of the lip portion shown in the drawings is thirteen degrees. I believe that angle may be increased to about fifteen degrees and may be decreased to about four or five degrees without any radical effect on the general operation of the saturator. However, with the above mentioned mouthpiece dimensions, I now believe that an increase in the angle above thirteen degrees would be disadvantageous because it would reduce the velocity of the gas in the portion of the gas space adjacent the inner edge of the lip portion * * * so as to significantly reduce the above mentioned rippling and atomized actions adjacent the center of the surface $B^2$. I now believe also that an angle smaller than four or five degrees is conducive to a bath liquor surging action which will subject the tank structure to objectionable mechanical stresses and which produces a sort of pulsating gas outflow beneath any particular small portion of the corner edge $D^6$. Such flow pulsations reduce the efficiency of the scrubbing action and are conducive to objectionable salt deposits on the under side of the mouthpiece lip."

The communication of the Examiner to the plaintiff's attorney of October 29, 1946, is in part as follows: "As stated on page 14 of the specification, the lim-

iting range of 4 to 15 degrees for the angle of the cracker pipe mouth flare to the horizontal is based upon conjecture. It appears from Figure 10 and the discussion thereof that this may not be the case and that the limits might actually be based on experimental evidence. However, the disclosure should be so worded as to state the limits positively rather than as a prophetic statement of belief. It is not clear what Figure 8 is intended to show. The curves appear at best not to represent any important operative control, but they also seem inaccurate in that any increase in pressure head would cause an increase in gas velocity. It does not appear that these two factors can be independently varied. Since the figure adds nothing to the case it might be cancelled; if it cannot be more adequately explained. The claims are rejected as based upon an indefinite disclosure. The new figure of 65% of the radial extent of the tank being taken up by the flared discharge pipe is new matter and the insertion directed on page 20 by the amendment filed June 25, 1946, is required to be cancelled. A careful consideration of the claims indicates that they are indefinite in that, on reading them, one gets the impression that the slope of the flare is upward from the pipe rather than down. The following claim, considered allowable, is suggested as representing the inventive concept in acceptable form:". Then follows the suggested form of claim, which is the same as claim 1 of the patent. The plaintiff's attorney, on November 25, 1946, and in response to the office action of October 29, 1946, amended the application and cancelled all claims except claims 1, 2 and 3 of the patent, which were subsequently allowed.

The original file wrapper shows certain patent references of record in the file:

U. S. patent Sperr, 1,986,900, January 8, 1935; U. S. patent French, 2,123,887, July 19, 1938; U. S. patent Pennock et al., 1,012,273, December 19, 1911; Great Britain, 361,935, November 23, 1931; German Still, 648,540, August 3, 1937;

German Koppers, 272,601, April 4, 1914; German Still, 657,439, July 19, 1936.

Plaintiff's attorney, on June 29, 1944, amended the application and, in the typewritten remarks accompanying the amendment, referred to other prior art patents, namely:

U. S. patent Marquard, 1,589,809, June 22, 1926; U. S. patent Mueller, 1,936,308, November 21, 1933; U. S. patent Underwood, 2,002,557, May 28, 1935.

That Otto, at the time of filing his application, considered the matter of horizontal gas flow to be the heart of his invention is shown by the fact that it is the important feature stressed in the sixteen original claims. All of them include this feature. Some, such as claim 1 and claim 7, claim it very broadly. Others claim it in combination with other features. But the Patent Office refused to recognize these claims as defining invention and allowed very limited claims, as shown in claims 1, 2 and 3 of the patent.

The defendants have cited other patents and publications prior to the alleged invention of Otto and more than one year prior to Otto's application for his patent, namely:

U. S. patent Sperr, 1,928,509, September 26, 1933; U. S. patent Ogden, 2,226,101, December 24, 1940; German patent Wagener, 216,069, February 19, 1909; Thau article, Publication Oel Kohle, pages 307–309, May 1, 1941.

The defendants rely on these cited patents and also on Still 648,540 and Koppers 272,601 in urging invalidity of Otto patent No. 2,423,794 because of prior disclosure of Otto's claimed invention and every material and substantial part thereof. Copies of all prior art patents and the Thau article are to be found in Defendants' Exhibit 18. Referring to patents to Koppers, Ogden, Sperr, Still and Wagener and to the Thau article, it would appear that each of these items of prior art discloses a saturator having a bell mouth, and it would further appear that the object of the bell-mouth is to

spread the gas horizontally. The angles of these bell-mouths vary from the relatively steep angles of Koppers and Figure 19 (page 309) of the Thau article, to the flatter angles of Ogden, Sperr, Still and Figure 16 (page 308) of the Thau article.

One of the most significant patents is that to Wagener. This patent was explained in detail by the witness Helm, an expert for the defendants (Trans., pages 437–440), and his explanation appears to support his conclusion that the only difference between Wagener and plaintiff Otto is that in Wagener the flared portion of the crackerpipe has a slight upward inclination. Wagener says that, in his saturator, "the gas is spread out in a flat layer upon the top of the bath and is brought into the most intimate possible contact with the latter". Of the prior art references applied by the defendants against plaintiff Otto, only Koppers and Still were cited by the Patent Office.

From the prior art, the Court concludes that the horizontal flow of gas into the mother liquor bath was well known for some time prior to the filing of the Otto application. If that is true, wherein does Otto's claim to invention in his flare-mouth patent lie? Is it invention (1) because the bell-mouth slopes downwardly to horizontal at an angle specifically limited to the range of 4° to 15°; or (2) because the bottom of the bell-mouth is located "slightly below" the overflow level of the liquor bath; or (3) because the patent specifies a rate of gas flow in excess of two cubic feet per second per inch of length of the discharge edge of the downwardly sloping surface?

Consideration will first be given to question (1) above. As has been shown, the Patent Office required the adoption of a specific range of angles, or a downward slope of from four degrees to fifteen degrees to the horizontal. However, nothing was produced, either before the Patent Office or at the trial of this case, to show that this range is critical. The graph or chart, Figure 8, of the patent contains no evidence that there was any-

thing critical in this range of angles. In fact, the Examiner stated in the office action of August 25, 1943, "It is not clear what Figure 8 is intended to show;" also, "the limiting range * * * for the angle of the crackerpipe mouth flare to the horizontal is based upon conjecture". Otto himself admitted that Figure 8 does not show that the four degree to fifteen degree range is critical. In response to questioning by his attorney at the trial (transcript page 287), Otto stated: "It is right what I said yesterday, that I accepted the limits of the Patent Office to limit the patent to the claim between the critical points four and fifteen degrees. But I agree that that is not definitely shown on this graph. Today looking at this graph, I should say you could say that the limit is between one and ten degrees, etc.". It was contended by Otto that line 9 as shown on Figure 8 can be extended by "extrapolation", but such extension can be based solely on the theory that the line would continue indefinitely at the same angle it had before it left the graph. Such "extrapolation" would preclude any abrupt change of angle where it would cross the vertical line representing a fifteen degree angle. Otto admitted that there was no abrupt change in either of the lines 9 and 10 at four degrees or at fifteen degrees, but I am unable to find any abrupt change at one degree and ten degrees as Otto stated. Actually, the only abrupt change shown on the graph is in line 10 at 7.15 degrees, but no reference has been made at any time to this change, and evidently it is not abrupt enough to be critical.

At the most, the graph, Figure 8, merely shows that under certain conditions in a small model saturator containing water, the observer saw ripples. There is no proof that such ripples are present in a commercial saturator, or that they would contribute in any substantial degree to increasing the gas-liquid contact if they were present. Nor is there any proof that conditions observed in a small model containing water would hold true for a commercial

saturator containing "mother liquor", which has a much higher density than water, and contains ammonium sulphate crystals therein. The exact angle of the bell-mouth appeared, at the time of the filing of the patent application, to be a matter of minor consequence. The original specification stated that it was "practically desirable" to incline the wall of the bell-mouth at a small angle to the horizontal, and in several passages mentioned a minimum angle of four or five degrees; that the inclination to the horizontal of the under surface of the lip portion of the mouthpiece shown in the drawings is thirteen degrees; that Otto believes the angle may be increased to about fifteen degrees and may be decreased to about four or five degrees without any radical effect on the general operation of the saturator; that an angle smaller than four or five degrees is conducive to a bath liquor surging action producing a sort of pulsating gas outflow, with a corresponding reduction of the efficiency of the scrubbing action.

Again, attention is directed to the proposal, disallowed by the Examiner, that the lower peripheral edge of flared discharge mouth should have "a radial extent of not less than 65% of the radial extent of the tank" to insure an effective damping opposition to surging movement of the bath liquor. There is nothing in the patent to indicate that 4° is a sharp division point, with no surging above 4° and with surging below 4°. In fact, the graph, Fig. 8, as explained in the specification (Col. 9, lines 3–8), shows that in the tests surging action occurred only at high rates of air flow and then only at angles between 0° and 1°. Otto confirmed this in his testimony (Trans., page 288).

On page 27 of the plaintiff's main brief appears this heading: "The Numerical Limitations in the Claims Are Not To Be Construed as Critical". Under this heading, beginning at the bottom of page 27, plaintiff's brief states: "From an examination of the file history of the patent (PX3), it is apparent that the Examiner in effect picked the 4° and 15° limits which Dr. Otto asserts are not critical in the sense that they define the precise limits of his invention." * * * "Dr. Otto further stated he did not know if one making a crackerpipe with a three-degree flare would infringe his patent or not since he did not know American patent law or the range of equivalents that could be applied to elements of his claims * * *. He felt that primarily his invention was defined in the graph from which one could determine for different installations the correct degrees of inclination. * * * It is seen, by reference to the original application as filed, that Dr. Otto did not state positively that the angles were critical, nor were they ever so represented to the Examiner and should not be so considered now." Therefore, it appears that counsel for the plaintiff and counsel for the defendants agree that there is nothing critical in the 4° to 15° limits.

Consideration will next be given to question (2). Claim 1 of the patent describes the rim of the flare-mouth as being "at a level slightly below the overflow level". Claim 3 refers to passing the gas beneath a surface which slopes downwardly, "the lower edge of said surface being below the normal liquid level".

There was no indication in the Otto application as originally filed that there was anything critical in any particular depth of submersion of the flare-mouth. None of the claims contained any statements relative to this depth of submersion until a claim was suggested by the Examiner in his action mailed October 29, 1946, and which was adopted by Otto in his amendment and finally Claim 1. There is nothing to be found, either in the patent or in the file history, concerning any advantage flowing from having the flare-mouth at any particular depth of submersion. Nor was any such evidence produced at the trial. In the absence of any showing of advantage, the inclusion in Claim 1 of the statement that the flare-mouth is located "slightly below" the surface does not help to dif-

ferentiate from the prior art patents. The evidence disclosed only three actual installations by Otto of the flare-mouth saturator. Each of these installations shows a different depth of submersion of the flare-mouth. In one installation, the flare-mouth was 8 inches below the minimum overflow level and 19 inches below the maximum overflow level. In another installation, the flare-mouth was 6 inches below the "bath liquor level". At a third installation, the flare-mouth was 2 inches below the minimum overflow level and 4 inches below the line marked "liquor level", which is presumably the normal level of the bath. In these actual Otto installations, the depth of immersion of the flare-mouth varied from a minimum of 2 inches to a maximum of 19 inches. No evidence was introduced to explain these differences or to show that any particular depth of immersion was critical.

Question (3) will next be considered. Claim 3 calls for a rate of gas flow "in excess of two cubic feet per second per inch of length of the discharge edge of said surface". The only advantage recited in the patent for this rate of gas flow is that it causes liquor to splash up onto the walls of the saturator and "In consequence, a down-moving film of bath liquor is maintained on the gas space wall which carries with it its sulphate crystal content of said film". (Patent, col. 12, lines 7–43). But Otto himself testified that this is done in every crackerpipe saturator and stated: "I do not think that this patent in suit has more entrainment or works in this respect different from the old-type crackerpipes".

Moreover, any claim for advantages resulting from a gas flow "in excess of two cubic feet per second per inch" is not supported by the graph shown on Figure 8. At the left of the graph is shown "gas flow in cubic feet per min." through a space having a "horizontal width of one inch". (Col. 8, line 75). The highest figure for gas flow is the top figure "50", which means 50 cubic feet per minute per inch of horizontal width. The rate specified in Claim 3 is two cubic feet per second and it follows that that rate multiplied by sixty would yield the rate per minute, or 120 cubic feet. This rate of 120 cubic feet per minute is more than twice the top rate of 50 shown on the graph. In other words, this rate is away above the graph, and there is no showing on Figure 8 that any specially advantageous results are obtained with angles of 4° to 15° and at the rate of 120 cubic feet per minute, nor is there any testimony in this case as to such results. It appears that this case contains no proof that a rate of gas flow as called for in Claim 3 is critical.

One of the references cited by the Examiner against the Otto flare-mouth application was the German patent to Still No. 648,540 (copy in defendants' Exhibit 18). In arguing against this patent, Otto's attorney said that it did not have an open bell-mouth, but that there is a solid bottom across the bell-mouth (file history, page 51, last paragraph). At the trial of this case, the defendants' witness Helm stated that, in his opinion, the drawing of the Still patent shows an open bell-mouth and that the "extra line at the extreme bottom of the bell-mouth represents ribs". (Trans., page 443). Helm stated that this was also shown in Figure 2 of the Still patent.

Plaintiff's attorney criticizes Helm's testimony and asserts that on cross-examination Helm "stated that he was mistaken". However, what Helm actually said was that he was mistaken about Figure 2, since Figure 2 is a section taken at a different point from that which he had in mind when he first testified. But he reiterated that the Still bell-mouth is open and has ribs. The actual statement by Helm on cross-examination was, "That is correct. I was wrong in saying Fig. 2 shows anything about the bottom of the bell-mouth, but that does not change my conclusion in any way that the bell-mouth crackerpipe is open at the bottom and provided with ribs". (Trans., page 586). Actually, the Still patent shows

a bell-mouth, called a "Distribution Ring 4", which spreads the gas out horizontally. The bell-mouth shown in this Still patent is at a flat angle, not specified, but presumably less than the 4° angle mentioned by Otto. There is no evidence in the record to contradict this testimony of the witness Helm, and it would appear that the record establishes this Still patent as a very pertinent reference.

Another reference cited by the Examiner was the German patent to Koppers No. 272,601 (copy in defendants' Exhibit 18). The witness Helm stated that this patent shows a saturator with a bell-mouth which performs the same functions as the Wheeling saturator is claimed to infringe. (Trans., page 441). Obviously, the purpose of using the flare-mouth crackerpipe is to spread the gas more widely through the liquor bath. In arguing against this Koppers patent, the only distinction Otto's attorney was able to point out was the difference in angle of the bell-mouth. (Trans., page 51). But, as hereinbefore indicated, no showing was made by Otto that there is anything critical in the 15° angle and this is, therefore, a mere difference in "degree". It appears to this Court that the Examiner was misled into believing that there was some invention in this Otto patent. He decided to allow Otto a very limited claim, so he suggested to Otto a claim into which he gathered all the "differences" he believed were present in the Otto disclosure, insisting, however, upon the 4° to 15° angles. There is no proof in this case of critical significance in the "differences".

It is well settled that a mere aggregation of old elements which, in the aggregation, perform no new or different function from that previously performed is not patentable invention. Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008; Anderson Co. v. Lion Products Co., 1 Cir., 127 F.2d 454, 457; Mabey v. Howard & Lewis Motor Sales, 1 Cir., 132 F.2d 40, 41. "An assembly of old elements taken from prior arts does not involve exercise of inventive faculty, even though assembly is beneficial and results in a successful improvement." Davis v. Buck-Jackson Corporation, D.C., 138 F. Supp. 908, affirmed 4 Cir., 230 F.2d 655, 658, certiorari denied 351 U.S. 950, 76 S.Ct. 846. In affirming the decision of the District Court, the Fourth Circuit Court of Appeals stated: " 'It is the conclusion of this Court that the Davis patent represents an assembly of old elements taken from prior arts relating to allied types of construction and, while undoubtedly a beneficial and successful improvement, does not involve the exercise of inventive faculty; thus the patent is invalid. Interstate Rubber Products Corp. v. Radiator Specialty Co., Inc., 4 Cir., 214 F.2d 546.' "

A recent case on "criticality" is Helene Curtis Industries v. Sales Affiliates, D.C., 121 F.Supp. 490, affirmed 2 Cir., 1956, 233 F.2d 148, 155. The law of "criticality" is set forth in the opinion of the District Court. 121 F.Supp. 490. In that case, the court held invalid a patent which covered the use of mercaptan in hair waving, and the claims of the patent contained some numerical limitations. In holding the claims invalid because the numerical limitations in the claims were not in fact critical, the Court of Appeals said: "At most, all these limitations disclosed some teaching—perhaps useful teaching—as to matters of degree affecting the use and selection of mercaptans in hair waving. But such teaching, we hold, did not rise to the level of patentable invention: it did not warrant a private monopoly over the preferred area of the previously disclosed genus of mercaptan hair waving. * * * 'Thus, as has frequently been said, the mere location of the optimum conditions of use for a known composition of matter does not constitute "invention" so as to entitle the discoverer thereof to a monopoly. That objective, however useful the final result, can be achieved by "patient experiment" [citing cases]; no inventive genius is necessary. Rather, it is only where, other

requisites being present, the patentee has found a point or points at which some result differing in kind—and not merely in degree—from the results achieved by the prior art, that an inventive act may be said to exist.'"

■ Plaintiff's main brief states that Otto did not state positively that the angles were critical, nor were they ever so represented to the Examiner, and should not be so considered now. It was the Examiner who, for some reason not of record, picked the 4° to 15° limits and put them into a claim which he suggested to Otto's attorney. Whether it was represented to the Examiner that the angles were not critical cannot be determined because the arguments which led to the allowance of the claims were omitted from the file history. It is the opinion of this Court, from an examination of the file history, that the Examiner considered the range 4° to 15° to be critical, else there is no rational explanation of his allowance of the claims of the patent. It seems clear that if the Examiner had been informed that "the numerical limitations in the claims are not to be considered as critical", he would never have allowed the claims. The Court concludes that the patent is invalid for lack of invention. In view of this conclusion, it would seem unnecessary to consider the matter of infringement. However, that issue will be discussed briefly.

Otto's broad claims were rejected and withdrawn while the alleged invention was pending in the Patent Office. In view of the evidence at the trial which will be hereinafter mentioned, Otto is, in effect, contending that the narrow and limited claims should be given the same breadth and interpretation as the abandoned claims. If the patent could be found valid at all, it should be strictly construed and alleged acts of infringement must fall within the limited range of the allowed claims. It is not a proper case in which to apply the doctrine of equivalents.

The evidence introduced at the trial disclosed that the installation of the flare-mouth crackerpipe by Koppers at Wheeling had an inclination of 3° from the horizontal. It was not within the range of 4° to 15° specified in Claim 1 of the patent. In addition, the evidence disclosed that the rate of gas flow at the Wheeling installation never, at any time, equalled or exceeded the rate of two cubic feet per second "per inch of length of the discharge edge" of the rim. In normal operation, the throughput of gas in that installation was 1.56 cubic feet per second, although for a short period an abnormal and temporary throughput was at the rate of 1.97 cubic feet per second per inch of the discharge edge of the rim.

Infringement of Claim 2 of the patent, which called for slots, is not seriously urged by the plaintiff, but the evidence disclosed that there were no slots in the Wheeling installation.

■■ If validity of the patent were sustained, for this Court to construe its claims as covering the invention as now asserted by Otto, it would have to give to the patented claims a scope and effect equivalent to claims originally made by Otto, rejected by the Examiner, and cancelled in order to secure allowance of the patent. " 'Where a patentee has narrowed his claim, in order to escape rejection, he may not "by resort to the doctrine of equivalents, give to the claim the larger scope which it might have had without the amendments, which amount to disclaimer" ' ". Lewis v. Avco Manufacturing Corporation, 7 Cir., 1956, 228 F.2d 919, 924. " 'It is a rule of patent construction consistently observed that a claim in a patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent' ". Lewis v. Avco Manufacturing Corporation, supra; Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 220, 312 U.S. 654, 61 S.Ct. 235, 85 L.Ed. 132. Cf. Falkenberg v. Golding, 7 Cir., 195 F.2d 482, 485; Baker-Cammack Hosiery Mills, Inc., v. Davis Co., 4 Cir., 181 F.2d

550, 563; Smith v. Magic City Kennel Club, 282 U.S. 784, 790, 51 S.Ct. 291, 75 L.Ed. 707; Dolgoff v. Kaynar Company, D.C., 18 F.R.D. 424, 428, and pertinent cases therein cited.

The bell-mouth saturators which are said to infringe this patent are no longer in existence as they have been replaced by saturators of different type, principle and design.

Other matters which were presented at the trial and urged by counsel were considered by the Court but space will not permit a discussion thereof and, in view of the Court's findings and conclusions, such discussion is unnecessary. Among these matters so presented are the following: (1) The presumption of validity arising from the issuance of the patent; (2) alleged commercial success of the bell-mouth crackerpipe; (3) the drawings, referred to as "The Preston Sketches", made of Otto installation by Koppers; (4) increased volume of coke oven gas handled by bell-mouth crackerpipe; (5) outline for lecture course given by Koppers' employee; (6) defendants' charge that bell-mouth saturator was on sale more than one year before Otto's patent application; (7) defendants' charge of indefiniteness of patent claims, etc.; (8) also the many cited court decisions.

Formal findings of fact and conclusions of law as to Patent No. 2,423,794 are as follows:

### Findings of Fact

1. A prior-art saturator utilized a horse shoe shaped crackerpipe located in an oval tank, and the crackerpipe brought coke oven gas into contact with a bath of "mother liquor" to remove the ammonia from the coke oven gas;

2. The saturator described in finding No. 1 was widely used at least as early as 1917;

3. The saturator mentioned in finding No. 1 is described in this patent, column 3, lines 49–65, as the one on which Otto made his alleged improvement;

4. Otto's alleged improvement consisted in substituting a bell-mouth crackerpipe for the horse shoe crackerpipe in the old saturator mentioned in finding No. 1;

5. During the prosecution of the application for this patent, the Patent Office was misled as to the following facts:

(a) The Patent Office was led to believe that there is something critical in the range of 4° to 15°, whereas there is not;

(b) The Patent Office was led to believe that there is something critical in locating the bell-mouth "slightly below" the surface of the bath, whereas there is not;

(c) The Patent Office was led to believe that there is something critical in the rate of gas flow recited in Claim 3 of the patent, whereas there is not;

(d) Incorrect statements were made to the Patent Office concerning prior-art patents;

6. Bell-mouth crackerpipes having different angles of slope of the bell-mouth and at different depths of immersion are shown in the prior art;

7. In Otto's bell-mouth saturator installations, the depth of immersion of the bell-mouth varied between two inches and nineteen inches;

8. The record of this suit contains a number of prior-art patents that were not before the Patent Office and which are pertinent;

9. In the Wheeling bell-mouth saturator which is alleged to infringe Claims 1 and 3 of the patent, the bell-mouth had a slope of 3° from the horizontal;

10. Said Wheeling bell-mouth saturator did not have slots as specified in Claim 2 of the patent;

11. The Wheeling bell-mouth saturator did not have the rate of gas flow specified in Claim 3 of the patent.

### Conclusions of Law

1. This patent in suit, No. 2,423,794, is owned by Otto, the plaintiff-patentee;

2. Consideration of the charge of infringement is here limited to the bell-

mouth saturators which are no longer in existence, but which were formerly owned and operated by defendant Wheeling at Follansbee, West Virginia, in this judicial district, and which were installed there by defendant Koppers;

3. Otto did not make an invention when he replaced the horse shoe crackerpipe in the saturator described in Finding of Fact No. 1 by the bell-mouth crackerpipe described in the patent;

4. There is nothing patentable in choosing an angle in the range of 4° to 15° for the bell-mouth;

5. There is nothing patentable in locating the bell-mouth "slightly below" the surface of the bath;

6. There is nothing patentable in providing a gas flow through the bell-mouth "in excess of two cubic feet per second per inch of length of the discharge edge of said surface";

7. There is nothing patentable in combining two or more of the features described in Conclusions of Law Nos. 4, 5 and 6;

8. This Otto patent is invalid as involving no invention over the prior art of record in this suit;

9. The new evidence in this suit, including new prior art that was not before the Examiner, and expert testimony, overcome the presumption of validity;

10. This patent is not a pioneer patent and, if valid at all, is at best a narrow patent and its claims must be strictly construed;

11. The Wheeling bell-mouth saturator did not infringe because—

(a) Its bell-mouth had an angle of 3° from the horizontal and did not come within the 4° to 15° range recited in Claim 1 of the patent;

(b) It did not have the slots recited in Claim 2;

(c) It did not have the rate of gas flow specified in Claim 3 of the patent;

12. Defendants' counter-claim for a judgment of invalidity and non-infringement of the claims of Patent No. 2,423,794 is well founded in law, on the basis of the facts established in this record, and plaintiff's complaint, in so far as it pertains to this patent, will be dismissed. The judgment prayed for is proper and will be ordered.

### U. S. Patent No. 2,599,067
### (Otto Spray)

The application for this patent was filed on March 15, 1948, and United States Letters Patent No. 2,599,067 were duly and legally issued on June 3, 1952, to plaintiff as the inventor of the invention in production of ammonium sulphate therein described and claimed. The patent as issued contains nineteen claims and plaintiff charges that the defendants infringe basic method claims 1, 2, 4, 7 and 8 and basic apparatus claims 14, 15, 16, 18 and 19. The claims here involved are set forth in footnote.[1] Plaintiff's counsel withdrew the charge of infringement of all other claims by letter to the Court dated February 10, 1956, even though the pre-trial conference order set forth the charge of infringement of claims in addition to those appearing in footnote.[1] The claim of infringement arises from an installation of coke oven gas, spray type, satu-

---

1. (1) The method of continuously producing sulphate of ammonia which comprises passing into a substantially unobstructed scrubbing space a gas containing free ammonia, contacting such gas with saturated ammonium sulphate solution containing free sulphuric acid, withdrawing ammonium sulphate liquor to make up such solution from a body of ammonium sulphate liquor in a crystallizing space below said scrubbing space, said contacting being effected by spraying

by whirling motion and under such pressure so as to disperse said solution in fine spray over substantially the whole cross-sectional area of the space and permit solid crystalline particles and supersaturated liquid spray to fall into said body whereby the growth of ammonium sulphate crystals in said body is promoted, withdrawing crystals from said crystallizing space and adding sulphuric acid to the liquor to make up for the acid

rator equipment by defendant Koppers for defendant Wheeling in Brooke County in the Northern District of West Virginia. The installations were made during the year 1952 and continue in use.

This patent pertains to methods and apparatus for removing ammonia from coke oven gas by the use of liquid sprays and the production of ammonium sulphate. Otto testified that he made the invention therein described in May

combining with ammonia in the scrubbing space.

(2) A method as specified in claim 1, in which the liquor introduced into said scrubbing space entrains ammonium sulphate crystals.

(4) A method as specified in claim 1, in which the acid content of the liquor sprayed into the scrubbing space adjacent such gas inlet is about 5 or 6 per cent by weight, and in which the acid content of the liquor sprayed into said scrubbing space more remote from said inlet exceeds the first mentioned acid content.

(7) The method of continuously producing sulphate of ammonia which comprises passing into a substantially unobstructed scrubbing space a gas containing free ammonia, contacting such gas with saturated ammonium sulphate solution containing free sulphuric acid and entraining solid crystalline particles and reacting with the free ammonia to form supersaturated ammonium sulphate liquor, withdrawing supersaturated ammonium sulphate liquor from said scrubbing space and desupersaturating the latter to make up all of said solution used in carrying out the method from a body of ammonium sulphate liquor in a crystallizing space below said scrubbing space, said contacting being effected by spraying under such pressure so as to disperse said solution in fine spray over substantially the whole cross sectional area of the space and permit solid crystalline particles and supersaturated liquid spray to fall into said body whereby the growth of ammonium sulphate crystals in said body is promoted, withdrawing crystals from said crystallizing space and adding sulphuric acid to the liquor at a rate so related to the rate at which the ammonia containing gas is passed into said scrubbing space as to effect the reaction of substantially all of the ammonia in the gas with the acid, and make up for the acid combining with ammonia in the scrubbing space.

(8) A method as specified in claim 7, in which the gas passes first through an inlet portion and thence through an outlet portion of said scrubbing space, and including the step of adding make-up acid mainly to the liquor sprayed into the last mentioned portion of the scrubbing space.

(14) In a coke oven by-product plant including apparatus for producing ammonium sulphate crystals by scrubbing coke oven gas containing ammonia with an acidified ammonium sulphate solution, the combination with structure formed with a crystallizing space and a substantially unobstructed scrubbing space, and including wall structure surrounding said crystallizing space and said scrubbing space, non-blocking spray nozzles mounted in said structure, said scrubbing space having a lower liquor and crystal outlet arranged to discharge into said crystallizing space, and having a gas inlet and a gas outlet each spaced away from said nozzles, each of said nozzles being arranged to discharge a liquor spray and crystals into an adjacent portion of said scrubbing space, said nozzles being arranged to disperse said spray over substantially the whole cross sectional area of said scrubbing space, gas conduit means connected to said structure and communicating with said scrubbing space for passing coke oven gas into said scrubbing space through said gas inlet and for withdrawing gas from said scrubbing space through said gas outlet, means connected to said structure for withdrawing saturated ammonium sulphate liquor and crystals from said crystallizing space and spraying said liquor and crystals into said scrubbing space and comprising pumping means having inlet conduit means connected to said crystallizing space for the withdrawal of liquor and crystals therefrom, and having outlet conduit means for discharging liquor and crystals withdrawn from the crystallizing space and including a separate conduit connection to each such nozzle, and means for adding make-up sulphuric acid to the liquor passing from said crystallizing space to said nozzle means, at a rate so related to the rate at which the gas containing ammonia is passed into said scrubbing space that substantially all of the ammonia in the gas reacts with the sulphuric acid to form ammonium sulphate liquor and crystals, whereby substantially all of the ammonium sulphate liquor sprayed into said scrubbing space is liquor which has been previously withdrawn from said scrubbing space.

(15) Apparatus as specified in claim 14, in which said gas conduit means in-

of 1946. Therefore, all public knowledge of the art prior to that date is pertinent to the issue of validity.

The claims in Otto's original application were directed broadly to passing, by means of spray nozzles, mother liquor (saturated acidulated ammonium sulphate liquor) through coke oven gas in an unobstructed scrubbing space, passing coke oven gas through that space, stirring the supersaturated mother liquor in a crystallizing pool, removing the large crystals of ammonium sulphate, and respraying the mother liquor, containing entrained crystals, through the scrubbing space. Prior to the filing of this original application for letters patent, Otto filed other applications concerning the same subject matter and bearing the numbers and the respective filing date of each as follows:

Application 659,444 filed April 4, 1946; Application 668,392 filed May 9, 1946; Application 674,334 filed June 4, 1946; Application 720,593 filed January 7, 1947; Application 771,196 filed August 29, 1947; Application 3,133 filed January 19, 1948.

The prosecution of the application for this patent in suit continued over a period of approximately four years. Otto's original claims and numerous amended

cludes a gas supply pipe having a horizontal discharge end portion for passing a stream of coke oven gas horizontally through said gas inlet and through a portion of said scrubbing space adjacent to said gas inlet and in which a portion of the liquor spray discharged by said spray nozzles is passed into said scrubbing space portion adjacent said gas inlet.

(16) Apparatus as specified in claim 14, including a pipe connected to said inlet conduit, means for connecting the latter to a source of cleaning fluid, and a valve in said pipe, whereby when said valve is open, cleaning fluid is sprayed into said scrubbing space through said non-blocking nozzles.

(18) Apparatus as specified in claim 14, in which the structure forming the crystallizing space includes a vertically disposed, open ended pipe having its upper end open to receive ammonium sulphate liquor and crystals passing downward through said scrubbing space, and a receptacle of a larger horizontal cross section than said pipe and into which said pipe depends and which cooperates with said pipe to form a crystallizer space external to said pipe and receiving liquor adjacent its lower end through the open lower end of said pipe, first and second conduit connections to said receptacle at respectively low and high levels, said first conduit connection forming a portion of said pumping means through which the latter passes liquor and crystals to said separator, and said second conduit connection forming a portion of said pumping means through which the latter passes liquor and entrained crystals to said spray nozzles, a second receptacle, and an overflow connection through which liquor in the first mentioned receptacle

above said relatively high level overflows into said second receptacle.

(19) In a crystallizing and reaction tank system for producing crystals of $(NH_4)_2SO_4$ by reaction of ammonia containing gas with $H_2SO_4$ solution, tank apparatus comprising a reaction tank section and a crystallizing tank section, said reaction tank section having an inlet for a conduit for passing the ammonia containing gas into an inlet portion of said reaction tank section, a spray nozzle with fluid rotating passage walls located adjacent said inlet so as to immediately contact the entering gas with spray reaction with the ammonia containing gas, a plurality of spray nozzles with fluid rotating passage walls located in an unobstructed portion of said reaction section, displaced from said inlet section, and arranged to cover the cross sectional area of said unobstructed portion with spray, and an outlet conduit for gas in said unobstructed portion, said crystallizing tank section being arranged to receive solution and crystals moving down from the bottom of said reaction tank section to said crystallizing tank section, a suspension conveying system including said crystallizing tank section, pumping means for conveying a suspension of crystals from a portion of said crystallizing tank section containing relatively large crystals to a crystal separating device, and conduit means connected to a portion of said conveying system which follows said portion containing relatively large crystals and which includes conduits through which suspensions of crystals are passed to the spray nozzles in the unobstructed portion of said reaction section and inlet means for the addition of fresh acid to said suspension conveying system.

claims were rejected by the Patent Office Examiner and were canceled by Otto. The specification was amended and revised and the claims were rewritten to distinguish from the prior art cited by the Patent Office. The prosecution of the application was interspersed with numerous personal interviews and repeated long arguments.

The inventive concept of producing ammonium sulphate by spraying saturated acidulated sulphate liquor into a gas stream passing through an unobstructed scrubbing space in a saturator by means of spray nozzles, thus causing the falling sprayed liquor to contain solid crystals of ammonium sulphate, was disclosed in Otto application 674,-334, filed June 4, 1946.

The full invention described and claimed in patent 2,599,067 was reached as the culmination of the successive inventions disclosed in these earlier Otto co-pending applications. This patent was granted after examination and consideration of the prior art which is shown in the file history. The rejections of certain claims by the Examiner were reviewed by the Board of Appeals.

The following references are of record in the file of this patent:

### United States Patents

| Number | Name | Date |
| --- | --- | --- |
| 441,106 | Monsanto | Nov. 18, 1890 |
| 1,799,478 | Peebles | Apr. 7, 1931 |
| 1,932,674 | Pyzel | Oct. 31, 1933 |
| 2,000,038 | Schwalenbach | May 7, 1935 |
| 2,035,441 | Allen et al. | Mar. 31, 1936 |
| 2,045,301 | Langer | June 23, 1936 |
| 2,288,667 | Allen et al. | July 7, 1942 |
| 2,375,922 | Jeremiassen | May 15, 1945 |
| 2,409,790 | Otto | Oct. 22, 1946 |
| 2,424,205 | Otto | July 15, 1947 |
| 2,424,207 | Otto | July 15, 1947 |
| 2,450,095 | Seebold | Sept. 28, 1948 |
| 2,482,643 | Tiddy | Sept. 20, 1949 |
| 2,549,848 | Otto | Apr. 24, 1951 |

### Other References

Fessenden, The Register of Arts, published in 1808 (page 87), C. & A. Conrad & Co., Philadelphia.

Defendants, in their amended answer, deny validity of the invention claimed, alleging that every material and substantial part thereof was disclosed in publications and patents prior to Otto's alleged invention, and was patented or described in printed publications or in public use in this country more than one year prior to the application for this patent, as shown by the following:

### "Patents"

| Brunck | U. S. | 824,092 | Patented June 26, 1906 |
| --- | --- | --- | --- |
| Doherty | U. S. | 997,908 | " July 11, 1911 |
| Bosch | U. S. | 1,029,528 | " June 11, 1912 |
| Eneas | U. S. | 1,101,264 | " June 26, 1906 |
| Becker | U. S. | 1,307,534 | " June 24, 1919 |
| Becker | U. S. | 1,375,483 | " April 19, 1921 |
| Becker | U. S. | 1,654,159 | " Dec. 27, 1927 |
| Becker | U. S. | 1,747,616 | " Feb. 18, 1919 |
| Berkhuijsen | U. S. | 1,985,010 | " Dec. 18, 1934 |
| Berkhuijsen | Swiss | 172,661 | " Oct. 31, 1934 |
| Tiddy | U. S. | 1,997,757 | " April 16, 1935 |
| Jeremiassen | U. S. | 2,375,922 | " May 15, 1945 |

### "Publication"

| Hutte Handbook (German) | Published in 1927 by Verlag VonWilhelm Ernst and Sohn, Berlin |
| --- | --- |

"Prior Inventor"

Charles E. Underwood

Bethlehem Steel Co.
Bethlehem, Pennsylvania

"Prior Public Use"

Bethlehem Steel Co.

Bethlehem, Pennsylvania

Koppers and Wheeling contend: That the Patent Office was misled by Otto's incorrect argument concerning "whirling sprays"; that there was nothing novel or inventive with Otto in 1946 in the use of liquid sprays; that Koppers had used sprays in saturators before 1946; that there was no invention in scrubbing coke oven gas with sprays in an unobstructed space; and that there was nothing novel or inventive in spraying mother liquor that contained ammonium sulphate crystals. It is the position of these defendants that this invention claimed by Otto was merely a "non-inventive" engineering evolution, using methods and apparatus known in the prior art.

■ It is a well established rule of law that the grant of the patent is prima facie evidence of its validity. 35 U.S. C.A. § 282; Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 1911, 220 U.S. 428, 434, 31 S.Ct. 444, 55 L.Ed. 527; Baker-Cammack Hosiery Mills v. Davis Co., 4 Cir., 1950, 181 F.2d 550, 564, certiorari denied 340 U.S. 824, 71 S.Ct. 58, 95 L.Ed. 605; Chesapeake & Ohio Ry. Co. v. Kaltenbach, 4 Cir., 1938, 95 F.2d 801; McKee v. Graton & Knight Co., 4 Cir., 1937, 87 F.2d 262.

■ The presumption of validity is strengthened where the patent was granted by the Patent Office after consideration of, and extensive administrative proceedings concerning, the same prior art as that relied upon by the defendants, or similar thereto. Hall v. Montgomery Ward & Co., D.C., N.D.W. Va.1944, 57 F.Supp. 430; Modern Products Supply Co. v. Drachenberg, 6 Cir., 1945, 152 F.2d 203, certiorari denied 327 U.S. 806, 66 S.Ct. 964, 90 L.Ed. 1030; Hildreth v. Mastoras, 1921, 257

U.S. 27, 42 S.Ct. 20, 66 L.Ed. 112; Reynolds v. Whitin Mach. Works, 4 Cir., 1948, 167 F.2d 78, 83, certiorari denied 334 U.S. 844, 68 S.Ct. 1513, 92 L.Ed. 1768; Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 1936, 80 F.2d 912, 919, certiorari denied 298 U.S. 673, 56 S.Ct. 938, 80 L.Ed. .1395.

■ The judgment of the Patent Office officials in granting the patent in view of the prior art is entitled to great weight and is to be overcome only by clear proof that they were mistaken and that there is a lack of patentable novelty. Hall v. Montgomery Ward & Co., supra; Gulf Smokeless Coal Co. v. Sutton, Steele & Steele, 4 Cir., 1929, 35 F.2d 433, certiorari denied 280 U.S. 609, 50 S.Ct. 158, 74 L.Ed. 652; Patterson-Ballagh Corp. v. Moss, 9 Cir., 1953, 201 F.2d 403; Lever Bros. Co. v. Procter & Gamble Mfg. Co., 4 Cir., 1943, 139 F.2d 633, 640.

■ However, it is well established also that, even though the patent is presumed to be valid, the presumption may be overcome by new references to prior art not considered by the Patent Office. Todd v. Sears Roebuck & Co., 4 Cir., 1954, 216 F.2d 594; Gomez v. Granat Bros., 9 Cir., 1949, 177 F.2d 266; Friend, Inc., v. Walsh, 2 Cir., 1944, 141 F.2d 180.

From the record in this case, from the file history of proceedings before the Patent Office Examiner and the Patent Office Board of Appeals, from written briefs and arguments appearing in the file wrapper identified as Plaintiff's Exhibit 1, and from the briefs and arguments submitted here, this Court concludes that Otto's concept of his invention can be simply described as follows: Passing through and from a spray nozzle or spray nozzles, under pressure, an acid-

570

ified saturated solution of ammonium sulphate (containing entrained ammonium sulphate crystals) in the form of a finely divided spray through coke oven gas containing ammonia while the gas is being pumped or forced through an unobstructed space in what is commonly known to the art as a saturator.

On page 34 of plaintiff's main brief appears this heading: "The Disclosure of Patent 2,599,067". Then near the bottom of the same page and continuing on page 35 appears the following:

"The particular spray disclosed in the drawings and specification of Patent 2,-599,067 is a 'whirling spray', defined as the type of spray produced by a Spraco nozzle such as shown in the Eneas Patent 1,101,264 (PX2; PX26A and 26B).

"Unobstructed space is disclosed as a space in which there is no obstacle to impede the gas flow from its inlet to its outlet * * *.

"The sprayed liquor with which Dr. Otto is concerned is an acidified saturated solution of ammonium sulphate containing entrained crystals.

"It is important to remember these three distinctions in examining the prior art. It will then be clear that no patent nor publication nor prior use discloses a saturator embodying *these three features*." (Emphasis supplied.)

It appears clearly that Otto did not invent the type and kind of spray nozzles used in his patented method of spraying the ammonium sulphate solution through the coke oven gas. He purchased these on the open market from the manufacturer and these spray nozzles themselves are described in U. S. Eneas Patent 1,-101,264, and further described in pages from a catalogue of the manufacturer, Spray Engineering Co., of Somerville, Massachusetts, submitted to the Patent Office Examiner at an oral interview on August 1, 1950, and shown in Plaintiff's Exhibit No. 2. Excerpts from Otto's testimony on cross-examination, taken from pages 199 and 200 of the transcript, are quoted as follows:

"Q. * * * What do you mean and what do you understand by the

word 'spray' in your patent? A. A subdividing of liquor, or a subdividing of a stream of liquor in small particles."

* * * * * *

"Q. You didn't invent anything yourself in regard to sprays or spray nozzles, so far as your patent on the spray type saturator is concerned, did you? A. No. In connection with the spray type saturator, no, I did not invent a new design of a spray.

"Q. As a matter of fact, the sprays that you used and referred to in your patent, and that you use in your saturators, had been on the open market and on sale long before your alleged date of invention in the spray patent, is that right? A. That's right.

"Q. And you simply bought them up yourself and put them in your saturator, so to speak? A. That's right.

"Q. And you can buy them—they will give you most any kind of spray you want—can't you—coarse sprays, fine sprays? A. That's right.

"Q. Streams, mists, atomizers or what not? A. That's right.

"Q. And that was all well long before anything you claim in either patent? A. That's right."

Further excerpts from Otto's testimony on cross-examination, beginning on page 209 and continuing through page 212, follow:

"Q. Now, Doctor, the essential feature of the Otto spray saturator, as you understand it, is the spraying of sulphuric acid through an unobstructed space through which coke oven gas passes, isn't it? A. This spraying is not of sulphuric acid. The spraying of an acidified ammonium sulphate solution through an unobstructed space.

"Q. Well, as I understand it, you have modified my statement by defining the liquid that is sprayed to be an acidified solution of sulphuric

acid .containing ammonium sulphate? A. That is right."

\* \* \* \* \* \*

"Q. Now the liquid you are talking about is mother liquor that has previously passed through the saturator and has been drawn off at some place and then is recirculated. Isn't that right? A. That is right.

"Q. So that the essential feature then is spraying liquor containing sulphuric acid and ammonium sulphate crystals through coke oven gas. Is that right? A. Not mainly sulphuric acid, but mainly mother liquor containing crystals, this liquor being acidified with sulphuric acid. Sulphuric acid is a small proportion of this liquor.

"Q. Well, the liquor that is circulated in your spray type of saturator is simply a part of the mother liquor that has already been used, is it? A. That's right.

"Q. Plus the addition of some sulphuric acid? A. That is right.

"Q. To make up for what has been lost by ammonium sulphate crystals that have been removed? A. That is right."

\* \* \* \* \* \*

. "Q. The same kind of mother liquor also resulted from the use of the crackerpipe saturator? A. It is the same type of mother liquor as in a crackerpipe saturator.

"Q. So what I am coming at and getting to, with some circumvention as part of my mistake, sir, is that the real crux of the invention which you are asserting is the spraying of a certain type of liquor through coke oven gas containing ammonia for the purpose of removing the ammonia. Isn't that right? A. That is right.

"Q. Now the question I was leading up to, the auxiliary matters—apparatus such as tar catchers, acid catchers, crystal separators, crystal graders, and so forth, is conventional apparatus not peculiar to spray type of saturators at all. Isn't that right? A. That's right.

"Q. And such apparatus was old and well known in the art and can be of any conventional type, as I understand it. A. Right.

"Q. And can be positioned at any particular place in the installation that is convenient and engineeringly satisfactory. Is that right? A. Right.

"Q. And not dependent upon any invention on your part as to where they are placed? A. These additional parts are not part of my construction.

"Q. So that what you really want to do by asserting this 067 patent is to prevent everybody else from spraying mother liquor through coke oven gas in an unobstructed space. Isn't that right? A. That is in so far right as we do not want anybody to do this without cooperation with us."

In Otto's deposition filed July 1, 1955, and identified as paper 22 in the court file, pages 40 through 43, the following questions and answers appear:

"Q. Now, aside from washing, what did you do to avoid the difficulties which you say had confronted you in using this spray-type of getting contact of the liquor—we will call it—with the coke oven gas? I think you said in the beginning that you knew sprays were old. You knew sprays were old even for coke oven gas. But you were confronted with certain difficulties. A. That's right.

"Q. I asked you how you knew of these difficulties, and as far as I recall, the only one you referred to was washing the walls. What other difficulties did you meet, and how did you solve them? A. Difficulties, to have a spray which was non-clogging, and I picked the spray which was known in the art, you see, this special Eneas construction, and where I expected to have no difficul-

ty with clogging up. They call it a nonclogging spray.

"Q. As I understand it, you went out and picked out, in the art, a commercial spray which would give you what you wanted—a spray nozzle? A. One which I hoped to give me what I hoped to get. You see, it could just as well happen that this spray, for example, would have, maybe, clogged up.

"Q. Did it give you what you hoped to get? A. Yes, it gave me, because I don't remember that that spray—that not a single spray in our saturator has ever blocked up.

"Q. And the spray that you bought on the open market gave you the results you wanted, without any modification by you—is that right? A. That's right.

"Q. Your patent speaks several times about spraying liquor through an unobstructed space. Just what do you understand or what do you mean to say by those words? A. That means, empty. As I understand, it is empty space. That means, no grids, or other filling, you understand, or wooden grids.

"Q. Well— A. (Interposing) That is well known in the art, where you can put in, for instance, tiles."

\* \* \* \* \* \*

"Q. I think, Dr. Otto, that you are taking my question to mean more than I did, and making it more complex than necessary. I want to know if what you meant by an unobstructed space was simply that your spray went into a gas chamber so that the spray could pass through the chamber without having to go to other surfaces, other than the walls of the tank, until it reached the liquor at the bottom of the tank. Is that what you mean? A. That's right."

At page 247 of the transcript, Otto testified to the same effect concerning "unobstructed space".

At page 60 of Otto's deposition, the following questions and answers appear:

"Q. I think you answered my question with a sentence four or five sentences back, when you said that once an engineer was told that he could remove ammonia from coke oven gas by spraying a liquid through the gas, the making of the apparatus would be just an engineering matter that any good engineer could do—is that right? A. Could design the apparatus to do it, you see. But nobody decided on that —that it was possible to do that.

"Q. Well, doesn't that mean, Doctor, that your position is that the essence of what you regard as your invention is spraying a suitable liquor through coke oven gas to remove— A. (Interposing) That's right.

"Q. —to remove ammonia? A. To spray saturated liquor containing crystals through nozzles in a fineness to give enough contact, through coke oven gas.

"Q. Well, I have to go back: the answer is yes. Now, the question of fineness (of spray), and so forth, is a matter that can be worked out by anybody by experiment? A. Yes."

At pages 78 and 79 of the same deposition appear the following questions and answers:

"Q. Well, is it fair to say, Dr. Otto, that the characterizing feature of any of the saturators you have built, is the use of the spray through an unobstructed chamber, through which the gas passes? A. Yes.

"Q. They have that in common? A. Oh, yes, they have that all in common.

"Q. Now, leaving that feature out, as I understand it, the other mechanical elements can be arranged in a great variety of forms and positional relations to each other—is that fair to say? A. Yes, that's right, but all have this feature what you have just mentioned.

"Q. And if you took that feature out, it wouldn't have much except just an engineering building proposition, would it? A. Well, I don't know if other features, perhaps, can also get some patents. It depends on the Patent Office, you see—other additionals which come up.

"Q. What I am getting at is, your idea of what is the essential idea of all your apparatuses that you have built. A. This is a fundamental, main feature."

At page 86 of the same deposition, the following appears:

"Q. What I am asking you is—and it is the only point that I had in mind—there is no virtue in one spray as distinguished from two sprays or half a dozen sprays, or whether they are arranged around in a circle, or whether there is one in the middle that covers the whole chamber? A. Mr. Brown, I would only say this: if you make too many sprays, then the sprays are so small, then you come to a point where the sprays will block up. I couldn't tell you where that point is. Then you find out, according, where you would have difficulties.

"Q. So, you can make any arrangement of sprays, with a wide variety, a wide range of variations, and still get satisfactory results? A. That's right."

On cross-examination, Otto testified as follows:

"Q. I want to know if you have done something and taught something in your patent that makes the use of the spraying of a solution of sulphuric acid through coke oven gas more effective, more efficient, more valuable or different in any way from prior spraying of sulphuric acid solutions through coke oven gas, and we will prove that that has been done, I think. A. In this general way I could not answer that question." (Trans. p. 227.)

\* \* \* \* \* \*

"Q. Doctor, is it fair to say that the crux and essence of what you regard as the invention described and claimed in the spray patent in suit is the use of sprays exclusively to take ammonia out of coke oven gas? A. You talk about the crux and essence?

(Mr. Brown to reporter—"Please read the question.")

"A. Our invention, or our process, is described clearly in the claims of our patent and that is not as broad as I think you just expressed yourself. It is the spraying of acidified saturated liquor. That means liquor of dissolved ammonium sulphate containing crystals in an unobstructed space.

"Q. That is the crux and essence of your invention as you have just stated it? A. That's right.

"Q. And that invention, as you understand, would be infringed regardless of the apparatus that was used to practice it, provided the process met the definition you have given. Is that right? A. That is right. That is the process claimed. I see here in our claim it is also inferred that this liquor gets supersaturated. It is also mentioned in there." (Trans. pages 267 and 268.)

Claim 1 of this patent includes as an element "said contacting being effected by spraying by whirling motion and under such pressure so as to disperse said solution in fine spray". Otto was interrogated at some length concerning the spraying by whirling motion and his answers were somewhat evasive. He seemed unwilling to admit that there is no whirling motion to the spray droplets of liquor after they leave the spray nozzle. At the bottom of page 213 and at the top of page 214 of the transcript appear the following question and answer:

"Q. The individual particle, when it leaves the nozzle, would travel in a straight line except as gravity may tend to draw it towards the

earth, or currents of gas might move it sideways, but otherwise it moves in a straight line. Is that right? A. I could not decide that. I think these special companies, if you are interested in that, they will tell you what these drops do. I know that the drops by this power of energy are separate and in small particles, which is the object of my construction."

At page 216 of the transcript, after further interrogation concerning the line followed by individual droplets, in answer to this question, "Disregard gravity and disregard currents of air, it would go in a straight line"?, Otto replied, "That's right, it would".

Otto's final conclusion concerning "spraying by whirling motion" was summarized at page 296 of the transcript on re-cross examination as follows:

"Q. Doctor, so that there may not be any mistake, my understanding is you testified yesterday and again today that any whirling there was of the liquid occurred inside of the nozzle? A. That's right.

"Q. All before it passed out of the nozzle? A. That's right.

"Q. So that there wasn't any whirling of the particles in the sense of projecting them in a spiral fashion after they left the nozzle? A. No."

Claims 2 and 4 of the patent, by reference to Claim 1, contain the same element—"spraying by whirling motion". It should be explained that Claim 1 in the patent is the same as Claim 61 presented to the Patent Office. Claim 2 is the same as Claim 62, and Claim 4 is the same as Claim 64.

The Court is convinced that the Examiner understood from Otto's presentation and arguments that the inventive feature of these claims, Nos. 1, 2 and 4 and even others, was based on the novelty and value of that whirling spray element.

An amended application was filed by Otto with the Patent Office, the oath thereto being dated September 25, 1951, which refers to interviews between the applicant and Examiner on August 1 and August 20, 1951. Certain portions of the application are quoted as follows: "At the interview which the applicant had with the Examiner on August 1, 1951, the Examiner expressed his willingness to allow the Claims 61, 62, 63 and 64 of the present amendment, in addition to the Claims 65–68 and 71–73 which the Examiner had previously found allowable.

"In accordance with the requirements of Rule 133(b), the reasons and explanations presented by the applicant at the above mentioned interviews as warranting favorable action on applicant's claims, are set forth in subsequent portions of these 'remarks'.

"At the August 1, 1951, interview, it was pointed out by the applicant that his practice of dispersing the liquor passed into the scrubbing space by a whirling motion as specified in Claim 61, is readily effected by the use of spray nozzles of standard forms, and in particular by the spray nozzles of the well known type disclosed in the Eneas patent 1,101,264.

"The foregoing references to the statements made by the applicant at the August 1, 1951, and August 20, 1951, interviews are based on the applicant's present recollection refreshed, as the Examiner will understand, by reference to draft amendments which the applicant had with him at the interviews and which the applicant had helped to prepare."

In his brief filed by Otto's attorney before the Board of Appeals, it is stated: "In the commercial use of his invention, the applicant uses spray nozzles of a well known type formed to discharge spray liquid with a whirling motion. While the applicant prefers to use such nozzles, there are other well known forms of spray nozzles which do not discharge spray with a whirling motion". Prior to the filing of this brief, the Examiner said: "Claim 61 defining the particularly whirling motion of the finely divided spray droplets, stated to give an im-

proved contacting between the crystals containing liquor and the gas being treated and thereby an improved yield, is considered to be allowable as are the dependent Claims 62–64". (File wrapper, paper No. 20, October 11, 1951). In the brief· of the Examiner filed with the Board of Appeals, it is stated: "Invention has been conceded in the process Claims 61–64 and 68 which define the whirling motion of the spray droplets as stated to give improved yield as expressed, for example, in Claim 68 which recites the spraying at three separate levels with a different type spray at the several levels giving the improved contacting as stated".

The cited Eneas patent, describing the swirling nozzle spray invention, makes it clear that divided liquid streams are given a swirling motion before uniting with a non-swirling stream in a mixing chamber within the nozzle. This causes the blended mass of liquid to issue in a "spray of substantially uniform homogeneity". The description of the Eneas nozzle in the catalogue submitted to the Examiner at the oral interview is in part as follows: *"The major portion of the liquid* passes through the outer vanes of the stationary turbine center and *is given a rapid swirling motion.* The remainder of the liquid passes straight through the center-jet and strikes the outer rotating mass just below the orifice in the mixing chamber, causing the liquid to issue from the nozzle in a full conical formation of equal density across its section". (Emphasis supplied.) There is no claim in the Eneas patent, or in the descriptive material furnished by the manufacturer, that the sprayed droplets have a whirling motion after they leave the nozzle.

At the trial it was shown that the liquid droplets have no whirling motion at the time they leave the spray nozzle and as they enter the gas in the unobstructed scrubbing space. However, Claims 61, 62 and 64, as allowed, (Claims 1, 2 and 4 of Otto's patent), were rewritten in amended form, were presented to the Examiner by Otto's attorney at the time of the August 1951 interview and there, for the first time, the *contacting of the gas and liquor is described as effected by spraying the liquor by whirling motion.*

Plaintiff, in his trial brief, states: "Koppers did not realize the importance of having a 'whirling' spray such as produced by Spraco nozzles * * *". In his main brief, he states: "The particular spray disclosed in the drawings and specification of Patent 2,599,067 is a 'whirling spray', defined as the type of spray produced by a Spraco nozzle such as shown in the Eneas patent * * *".

In plaintiff's reply brief, he refers to the "myth of the whirling spray" and terms it a "straw man" set up by the defendants in order to knock it down. He charges that the defendants imply that it must be understood as meaning that the sprayed droplets would move in a spiral path after leaving the nozzle. After further written argument, he states: "In the face of this, it is difficult for plaintiff to understand how defendants could hope to succeed in impressing the Court with their *whirling spray* 'straw man' * * *".

From this Court's understanding of the meaning of the words "spraying by whirling motion" and the view obviously presented by Otto's patent attorney to, and accepted by, the Examiner, it would seem that the "straw man" is, rather, a substantial giant. It is clear from the file history that the reason which prompted the inclusion of the "whirling spray" element of Claims 1, 2 and 4 was based on the theory that the *contacting* and the *resultant better yield* were accomplished by *spraying the mother liquor by whirling motion.* There could be no *contacting* of liquor and coke oven gas in the "unobstructed space" until *after* the liquor left the nozzle in the form of spray. The only whirling motion of the liquid was within the nozzle itself, which was designed to break the· liquid into drops of uniform size.

In considering further the questions here presented, the Court will assume that the reference in Claims 1, 2 and 4

to "spraying by whirling motion" was adopted for the sole and only purpose of identifying the particular type of spray nozzle used by Otto, and that he and the Patent Office were in full understanding and agreement as to such purpose, as he now argues. There remain three major assertions of invention—(1) spraying the mother liquor, to which sulphuric acid has been added, *in the form of finely divided spray*, (2) over substantially the whole cross-sectional area of the *unobstructed space* through which coke oven gas is passing, (3) said mother liquor containing *entrained crystals* of ammonium sulphate.

In plaintiff's reply brief under the heading, "What the 'Spray Saturator' in This Case Really Is", the following appears on page 17: "A spray saturator is a specific piece of apparatus accomplishing not only the function of scrubbing ammonia out of coke oven gas, but also the function of simultaneously producing by chemical reaction a useful by-product, ammonium sulphate, in solid crystal form. *The specific combination which characterizes the apparatus and method of Dr. Otto's invention is found nowhere in the prior art although all of the elements which go to make it up were old and readily available to workers in the art*". (Emphasis supplied.)

Defendants have cited certain patents and other prior art, as hereinbefore shown, which were not considered by the Patent Office. It will not be possible here to discuss all of them in detail but brief reference will be made to some which appear to bear upon the state of the art prior to May 1946, the claimed date of Otto's invention.

Doherty U. S. Patent No. 997,908, issued in 1911, describes a process of obtaining ammonia from coal. A copy of this patent is found in Defendants' Exhibit No. 18, and a chart showing the Doherty structure is identified as Defendants' Exhibit No. 19. Gas produced by heating coal is passed through absorption chambers, and at the top of each chamber is located "a plurality of spraying caps" having perforations in their faces. The streams of liquid discharged from these perforations intersect and impinge upon each other to produce "a very fine spray", which is discharged into the gas passing through an open unobstructed chamber. The spray is an "ammonia absorbing liquid" which "will usually be a dilute solution of sulphuric acid, the ammonia absorbed being fixed as ammonium sulphate". Claim 4 of the Doherty patent calls for recovering ammonia from coal gas by subjecting the gas to contact with a (sprayed) liquid capable of absorbing the ammonia. Fresh ammonia-absorbing liquor is "sprayed" into absorption towers at a rate at which saturated liquor is withdrawn from the towers. At page 3, column 1, beginning at line 64 of the patent, Doherty says: "It is apparent that my method of absorbing the ammonia insures the most intimate contact possible between the gas and the liquid, the absorption of the ammonia being rapid and complete. I thus reduce the capacity necessary in the absorbing apparatus to a minimum". Thus, this early patent meets Otto's basic idea of removing ammonia from coke oven gas by passing mother liquor in the form of "a very fine spray" through the gas in an unobstructed scrubbing space, collecting the saturated liquor for treatment in crystallizing equipment, and respraying the mother liquor, in a continuous process. Figure 4 of the drawings indicates that the spray chamber is clearly unobstructed.

Otto states in his main brief, at page 35: "Defendants cite Doherty as a disclosure of the use of sprays to remove ammonia from coke oven gas. It does show this, but it is none the less irrelevant here because (1) it is only another example of the use of a spray tower in the *unsaturated* solution method of ammonium sulphate production, (2) it does not go beyond many such examples considered and discarded by the Examiner, and (3) it differs in important specific respects from the requisites of an Otto spray saturator".

Bosch U. S. Patent No. 1,029,528, issued in 1912, a copy of which is shown in Defendants' Exhibit No. 18, describes a process of removing oxides of nitrogen from a gas by spraying a liquid, containing solid particles in suspension, through the gas. This is done by "introducing a suspension of an absorbent into the gas mixture in a state of fine division, for instance as a spray, or mist". This Bosch patent makes clear that the use of spray nozzles was old for producing such gas-scrubbing methods. While coke oven gas is not mentioned, it is obvious that the method is similar to that here involved in Otto's patent and that the problems and practices are analogous. The plaintiff says that there is no disclosure in the Bosch patent that the liquid so sprayed is saturated or tends to clog or encrust. He says that it shows spraying a slurry in an unobstructed space to remove nitrogen oxides therefrom; that it adds nothing to Doherty, supra, and the only apparent reason the patent was cited by defendants is as a disclosure of a spray tower.

Becker U. S. Patent No. 1,307,534, issued in 1919, a copy of which is shown in Defendants' Exhibit No. 18, shows diagrammatically a complete by-product coke oven and auxiliary apparatus for continuously treating coke oven gas to remove ammonia and other elements. Three treatment towers are shown each having inlet openings at the bottom and outlet openings at the top for a continuous passage of coke oven gas. In the top of tower 8 piping is shown, apparently used for spraying mother liquor through the gas to reduce the ammonia to ammonium sulphate. Fresh acid is continuously added to compensate for that removed from the system as ammonium sulphate crystals. The mother liquor sprayed into the top of the ammonia absorber tank is pumped from near the bottom of the crystallizing chamber. Consequently, it inevitably contains entrained crystals, just as called for in the Otto patent in suit, as all of the witnesses, including Otto, were of the opinion that the mother liquor obtained from the crystallizing chamber contains entrained crystals of ammonium sulphate. In Otto's deposition filed July 1, 1955, these questions and answers appear:

"Q. Don't you know of any patent or publication, prior to 1946, which showed and described apparatus in which coke oven gas was passed through a chamber at the top of which sprays were located, and the sprays were supplied from liquor which was drawn from the bottom of that chamber? A. I only know what you have mentioned to us—this patent of Becker that you refer to.

"Q. I didn't mention a patent of Becker. I am quite sure I didn't. A. I am sure you did. You brought it up."

* * * * * *

"Q. Now, understand, I didn't ask you about the Becker patent but I thought you said that that was— that my question was, in effect, a statement of what Becker shows. Is that what you meant to say? A. Yes, that is what I think.

"Q. That is what Becker shows? Becker shows what I asked you about—is that right? A. That's what I think there."

The deposition, at page 92, further shows that Otto was examining a patent at the time he was so testifying and it was identified as No. 1,307,534. Plaintiff argues that this patent shows ammonia being absorbed out of coke oven gas in a conventional acid washer tower and that there is a clear disclosure that unsaturated sprays were intended and, hence, no crystals would have existed in the spray of the acid washer tower.

The German Hütte Handbook for the Practical Chemist, published in 1927, illustrates and describes a "spray scrubber without obstructions" for "scrubbing" gas by passing it into the bottom of an open tank and out at the top thereof while spraying scrubbing liquid through "spray nozzles" located at the

top of the tank. This handbook states that the process and apparatus shown are "satisfactory * * * for carrying out rapidly-proceeding reactions and absorptions". Defendants urge that this reference is clear on its face as to the teaching of a gas scrubbing spray process; that "scrubbing" is a generic term that refers to removing some element from the gas treated; that the Otto spray patent in suit refers to his patented process as a "scrubbing" operation. Plaintiff objects to the reference on the ground that there is no disclosure in the particular section of the handbook cited by the defendants dealing specifically with the production of ammonium sulphate, but the section deals with the general subject of spray scrubbers and absorbers. Plaintiff urges that the most significant thing about Hütte is that he shows open spray towers to be good (although packed towers he says are better) as general chemical engineering tools, but when it comes to ammonium sulphate, he recommends the familiar crackerpipe.

Jeremiassen U. S. Patent No. 2,375,-922, issued in 1945, was considered by the Patent Office and was repeatedly cited by the Examiner as meeting Otto's basic claims. It describes a method of treating gas containing ammonia with a liquid containing sulphuric acid whereby sulphate of ammonia is formed. This patent, as does the Otto patent in suit, refers to known methods of removing ammonia, specifically the crackerpipe and the packed tower types of saturators. Jeremiassen treats ammonia-containing gas with sulphuric acid in the form of "liquid streams or jets which, to a greater or less degree, will be disrupted so as to form drops". Fresh sulphuric acid is continuously added to replace that taken out as ammonium sulphate crystals. Jeremiassen states that the liquor that has passed through the gas is recirculated through the gas. In both of the apparatuses shown in the patent drawings, a part of the "solution" that is passed through the gas is pumped directly from the crystallizing chamber, in which ammonium sulphate crystals are formed. All of the witnesses who testified in this case appeared to be in agreement that the mother liquor bath contains small crystals of ammonium sulphate in addition to the larger crystals which are formed and which settle to the bottom. It is this mother liquor which is recirculated and passed through the gas in the Jeremiassen process. This Court is led to the conclusion that this mother liquor contained entrained ammonium sulphate crystals. Otto's testimony concerning crystals in mother liquor would lead to that conclusion and witnesses Helm and Lowry testified that entrained crystals would be present in Jeremiassen's liquid showers. Plaintiff's expert witness, Professor Radasch, testifying in connection with the Tiddy patent hereinafter mentioned, apparently agreed that crystals exist at the top of a mother liquor crystallizing pool. Jeremiassen teaches that he depends entirely on a finely divided sulphuric acid and ammonium sulphate liquor passed through an unobstructed scrubbing space to react with ammonia and to produce ammonium sulphate. He refers to the liquid entering the unobstructed scrubbing space as a shower of streamlets or jets and creating a veil of liquid through which the gas must pass. He describes his process as producing the desired "very large contacting surface between the liquid and the gas", resulting in the production of ammonium sulphate, the larger crystals of ammonium sulphate settling to the bottom of the crystallizing chamber where they are removed. It is true that Jeremiassen intends to avoid the use of sprays in his process, but plaintiff's expert witness Radasch admitted that whether Jeremiassen's shower of sulphuric acid was called "sprays" or not, it would be effective to remove the ammonia from coke oven gas. Plaintiff argues that there are at least two primary differences between Jeremiassen's patented process and that of Otto. He says (1) that Jeremiassen does not disclose a process in which crystalline ammonium sulphate is formed in

the reaction zone, intending that the contact zone will be crystal free by keeping the circulating fluid within the limits of metastable supersaturation, and (2) he does not disclose that the liquid is dispersed in his reaction zone in a spray.

The record in this case contains much testimony from the expert witnesses who labored with their explanations and understandings of "metastable state" and "limits of metastable supersaturation". The experts certainly were not in agreement as to the exact meaning of these terms, nor were they in agreement as to the effect of the process.

Of course, Jeremiassen did not use spray nozzles of any kind, certainly not "whirling sprays" as does Otto, but he surely passed the gas through an unobstructed space and passed through this gas a flow of liquid in the form of "streams or jets which, to a greater or less degree, will be disrupted so as to form drops", thus creating a "veil" of liquid through which the gas must pass. Let us assume that no formation of crystals of ammonium sulphate actually occurred in the unobstructed space or the reaction zone, but the fact remains that the ammonia was scrubbed out of the gas by the fluid even though it was "within the limits of metastable supersaturation" and that the ammonium sulphate crystals later resulted from that process.

I turn now to the consideration of Tiddy U. S. Patent No. 1,997,757, issued in April 1935 (Defendants' Exhibit No. 37), which was cited by the defendants against Otto. This Tiddy patent describes a saturator for producing ammonium sulphate by reaction of sulphuric acid with ammonia. He states, as an object, removal of ammonia completely from gas containing it "by contacting such gases with a spray of acid". Tiddy produced his spray of "mother liquor" by rotating a cylinder, the lower portion of which dips in the surface of the liquor bath. He points out that the reaction of ammonia and sulphuric acid takes place at the surface of the liquid which be-comes quickly saturated with ammonium sulphate. The rapid rotation of the cylinder, dipping into the liquor bath, throws out a tangentially directed spray, which is shown as completely filling the unobstructed scrubbing space through which the ammonia-carrying gas is passed. The result stated is the complete removal of ammonia. This patent states as an object of the apparatus and method described: "To provide a process for the production of ammonium salts from an ammonia-containing gas and a fine spray of a solution containing an acid". He obviously had in mind the use of sprays of mother liquor for removing ammonia by contact with sulphuric acid solution to give maximum surface contact of gas and liquid and thus avoid "the establishment of back pressure on the stream of gas". The patent further states: "The sprayed liquor containing ammonium sulphate, both dissolved and crystalline, drips down the side of the spray chamber and is returned to the main body of liquid in the reservoir, which liquid thus becomes slowly saturated with ammonium sulphate". This would seem to be the basic process which plaintiff seeks to cover in his spray patent because, in Otto's patent, the mother liquor sprayed through the gas drops into a reservoir where the crystals grow in the supersaturated mother liquor, from which the large crystals are separated from the mother liquor. The processes of Tiddy and Otto would appear to be practically the same except that Tiddy creates his spray from the surface of the mother liquor bath, while Otto brings the mother liquor solution into the top of the unobstructed space and sprays the liquor through the gas by means of spray nozzles.

Professor Radasch had been engaged by Otto to make a study of the prior art and to testify as an expert witness at the trial on behalf of Otto. In his direct testimony, Radasch made no reference to this Tiddy patent No. 1,997,757 as bearing upon the prior art, but on cross-examination the witness honestly admitted that he had examined the patent and

testified as to Tiddy's teaching. The materiality of the testimony of Radasch will be apparent from questions and answers appearing in the transcript at pages 687–91:

"Q. Did you mean to tell the Court that in your research and study leading up to what you called the evolution of ammonium saturators, that you had found no references in the published art or patented article of a sulphuric acid solution being passed in finely divided form through ammonia gas for the purpose of removing ammonia prior to the Otto spray patent in suit? A. I found such a reference, yes."

\* \* \* \* \* \*

"Q. Well, would you mind telling me what it is now? A. No, sir. It is the Tiddy patent 1,997,757 filed in August, 1931, and granted in 1935.

"Q. What does that patent teach you as a chemical engineer and what, in your opinion, does it show as to projecting sprayed sulphuric acid solution into a space containing coke oven gas or other gas to be treated by the sprayed liquid? A. Well, it taught me a lot, because I knew something about that development and I knew that Mr. Tiddy had in mind the fact that a spray from a spray nozzle to do this job might not work on the basis of some other experience that he had had and that he devised a particular kind of spray equipment to do this job, which I distinguish from a spray tower type of equipment.

"Q. Well, so far as the interaction of the sprayed sulphuric acid solution into coke oven gas, the fine particles thrown up by the rollers in the Tiddy patent would interact with the coke oven gas and remove the ammonia in the form of ammonium sulphate, would they not? A. That's correct.

"Q. So that there, as you understand it, before the date claimed for his invention of the spray patent by Dr. Otto, which, for your information, I will tell you on the record was in May or later of 1946, so that this Tiddy patent, as you interpret it, showed that a prior inventor had proposed to remove ammonia from coke oven gas by spraying, or call it what you will, projecting fine particles of sulphuric acid solution through the gas? A. Mr. Tiddy very definitely did propose that."

\* \* \* \* \* \*

"Q. Professor, this Tiddy patent describes spraying the sulphuric acid through the coke oven gas. You have agreed with that? A. Yes, sir.

"Q. Will you also agree that this sprayed material was picked up out of the mother liquor bath which contained ammonium sulphate crystals? A. We haven't agreed to it yet. I can agree to it now."

\* \* \* \* \* \*

"Q. And will you agree that the material picked up and sprayed through the gas contains ammonium sulphate crystals? A. I think that would be the case, because while the bath is very deep there are undoubtedly crystals at the top of the bath. I am not too sure about that, though, Mr. Brown, because I don't know exactly what this condition would be at the top of the bath, but I think there are crystals in that spray liquor.

"Q. To help you perhaps make up your mind, will you look at page three of the patent, first column, second line, where the sentence is, 'The sprayed liquor containing ammonium sulphate'—"

\* \* \* \* \* \*

"Q. I was quoting that sentence, 'The sprayed liquor containing ammonium sulphate, both dissolved and crystalline', that refers and is a statement by Tiddy that his spray did contain ammonium sulphate crystals? A. Yes.

"Q. You agree to that? A. Yes, I agree.

"Q. Will you also agree that in the apparatus, which for the purpose of my question is illustrated in the upper part of Figure 2 at the right of the drawing, the space between the roller and the casing in which the gas is subjected to spray is unobstructed? A. Yes.

"Q. In other words, sulphuric acid solution containing ammonium sulphate

crystals is sprayed through coke oven gas in an unobstructed space, as I understand it? A. Yes, I would agree to that."

After this cross-examination, the plaintiff then introduced in evidence the original file wrapper in connection with one of Otto's earlier patent applications, namely, No. 659,444, in an effort to show that this Tiddy patent was mentioned as a reference and was considered by the Patent Office. However, there is no evidence before the Court that these earlier applications which culminated in Otto's spray patent in suit were vigorously prosecuted in the Patent Office, and there is nothing in the file wrapper of the patent in suit to indicate that the Examiner considered, in any particular, this Tiddy patent.

The defendants rely also upon the use of sprays by one Underwood, who was then in charge of saturator operations at the Bethlehem, Pennsylvania, plant of the Bethlehem Steel Corporation. Crackerpipe saturators were then in use at this plant and, sometime in the year 1942 and long prior to Otto's date of invention, Underwood modified these saturators by adding spray pipes in the unobstructed space through which the coke oven gas passed above the mother liquor pool. These pipes contained holes over which were welded plates, and as the liquor was pumped through the holes and against the plates, a splash spray was created. Underwood did not rely solely upon the spray method for removing the ammonia from the gas but to assist in the complete removal after partial removal by the crackerpipe method. While it is true that these splash spray installations by Underwood were used commercially for a period of some eighteen to twenty months, they were obviously not too successful since they were removed and replaced by an Otto flare-mouth dip type crackerpipe. These Underwood installations had difficulty with "salting up" and the spraying apparatus made cleaning operations necessary at frequent intervals. It does appear, however, that reports of Underwood's spray installations and operations were widely circulated throughout the industry, although Otto denies that he had any information relative thereto even though he installed the flare-mouth crackerpipe in these Bethlehem saturators in a little more than a year after the Underwood installations were removed.

Defendants introduced also charts showing commercial use of sprays in different locations and installations by defendant Koppers. Without going into complete detail, one such installation was said to use sprays to remove part of the ammonia at one place in the process while retaining the conventional crackerpipe to remove ammonia at another place. Also, defendant Koppers had experimented with the use of sprays alone, the spray being whipped up into a large chamber to remove the ammonia from the coke oven gas. The charts of these Koppers installations, Exhibits Nos. 27, 28, 29 and 30, were intended to support defendants' contention that the adoption of the spraying process and the abandonment of all forms of crackerpipe were a part of the evolution in the art, during which period of evolution the idea of reducing the differential pressure was being progressively carried out. Defendants' Exhibit No. 30, which shows Koppers' experimentation with the use of sprays alone, was intended by defendants to show, in addition to such use, that the experiment on this saturator was made within several months after Dr. Otto's alleged date of invention and long before the issuance of Otto's patent. The removal of ammonia from coke oven gas was accomplished, long years before Otto came to this country, by the use of the conventional crackerpipe saturator. The removal of the ammonia from the gas by that method was just as complete as by the Otto spray method and no new chemical reaction is involved in the Otto process.

Otto claimed, however, before the Patent Office other advantages and beneficial results. He claimed that his invention is characterized by a desirably low gas pressure drop, resulting in an appre-

582

ciable reduction in the pumping energy required to move the gas through the saturator; reduction of over-all size of saturator and floor space requirements; low construction, operation and maintenance costs; relative simplicity, unusually high utility and broad novelty.

Certain advantages of the spray-type saturator over other types of saturators were satisfactorily shown by the evidence. A much greater quantity of gas could be passed through and treated in a spray-type saturator in a given volumetric space in the saturator; troublesome salt deposits which tended to clog apparatus were materially reduced or practically eliminated; construction, operation and maintenance costs were lowered; the over-all size of the saturator could be reduced and less floor space for saturators was required.

The recent world war in which the United States was involved caused the steel producing companies to utilize their capacity to the limit and to plan thereafter for an even greater output of steel. That required increased coke production and this, in turn, required handling of greater volumes of coke oven gas in saturators occupying available space. The chemical art had long known that an efficient way of bringing a large volume of gas into contact with the surface of a liquid is to pass the liquid in finely divided form through the gas in an unobstructed space. The record shows that, by that method, more gas can be exposed to liquid surface in a given space in a given time than by other methods. Back in 1911, Doherty, in his patent No. 997,908, pointed out the rapidity of reaction and the space-saving features incident to the spray process. During this period of expansion of the steel companies, efforts were being made by Otto, Koppers and others to reduce the differential pressure head of eighteen to thirty inches. By the time of Otto's claimed invention of the spray-type saturator, the crackerpipe types had evolved until the differential in pressure had been reduced by several inches. It was a natural evolution of the art to change the saturators to handle more coke oven gas and it was most desirable to take care of it within the same space occupied by existing saturators because many of the steel companies have little available extra space. So the art turned to the old tool of the art, the spray method of bringing the sulphuric acid solution into contact with the coke oven gas. Otto himself admitted that the spray method of treatment of gases was old, well known to the art and a tool of the art.

In 1946, when Otto says he conceived his spray-type saturator, he had an order to install a flare-mouth crackerpipe saturator at the Lackawanna plant of the Bethlehem Steel Company. Otto sought and gained permission from the Bethlehem Steel people to install his spray saturator on the condition that the saturator be so designed that it could be converted back to a flare-mouth type in case it did not work satisfactorily. Otto testified that he was not free from doubt as to whether spray nozzles would clog up, but it appears from the evidence that the spray-type installation at the Lackawanna plant proved to be satisfactory. Within about two years following this installation, Otto sold to Bethlehem Steel and constructed a spray-type saturator at the Johnstown plant and there the spray-type replaced four of the old crackerpipe saturators. Other installations followed at Detroit, Indianapolis, Bethlehem and, lastly, three spray saturators for the U. S. Steel Corporation at Clairton. Otto has built nothing but spray-type saturators since his first installation for Bethlehem Steel.

It was stipulated by the defendants that the first spray-type saturator installed by Koppers was at the Neville Island plant of the Pittsburgh Coal & Chemical Company. This saturator went on the line in August 1949. It was originally designed for Spraco nozzles but, during the design stage, these were changed to splash plate sprays "in order to simplify the structure and reduce both operating and investment

cost". The splash plate sprays did not accomplish the desired ammonia removal from the gas, and baffle plates were then added on each side of the splash plate sprays and ammonia removal was considerably increased. Pittsburgh then experimented with Spraco nozzles, which were then substituted for the splash plate sprays and the ammonia removal was thereby further increased.

Koppers had originally planned to include splash plate sprays in the spray saturator installed by it at the Woodward Iron Co., Woodward, Alabama. After construction had begun on the saturator and after the splash-type sprays had been shipped to the building site, it was then decided to install Spraco nozzles in light of the experience gained at the Neville Island plant.

In 1948 or 1949, defendant Koppers had installed for defendant Wheeling, at its Follansbee, West Virginia, plant flare-mouth type saturators to replace crackerpipe-type saturators which had been in use since 1916. Subsequently, Koppers installed at the same plant for defendant Wheeling two saturators of the spray-type, one completed and placed in operation about April 1952 and the other about December of 1952. During the period between these installations, Wheeling's steel capacity was being increased and new batteries of coke ovens had been built, thus requiring greater saturator capacity for removing ammonia from the coke oven gas. These two saturators are not used simultaneously as either one is capable of handling the entire gas output. However, the two flare-mouth type saturators, which were replaced by the spray-type saturators, were used alternately and either was able to take care of the entire gas output. The change-over at Wheeling to the spray-type saturators did not change the number of men necessary as saturator operators, nor did it reduce the ground space or floor space since the two spray-type saturators occupy substantially the same space as the ones which were replaced. The pressure drop across the flare-mouth-type saturators was between ten and fifteen inches of water, and the pressure drop across the spray-type saturators at Wheeling is about six inches. More gas is being passed through the spray-type saturators than through the ones which were replaced. The sulphate production, in relationship to the amount of gas furnished the saturator, was approximately the same in both types. The Wheeling saturators are equipped with Spraco nozzles through which the mother liquor, after makeup sulphuric acid is added and containing entrained crystals, is sprayed through the coke oven gas in an unobstructed space.

The number, placement and arrangement of sprays and the direction of the sprayed liquor into the gas flow differ in many respects from Otto. Also, in Otto's apparatus he shows the main gas reaction chamber, or absorber proper, the crystallizing tank and the acid catcher as three separate pieces of equipment. These three components are necessary to make up what might be termed a complete ammonia absorber unit. In the Wheeling installations, these three components are combined in one integral unit.

From the evidence, the Court concludes that, since the Neville Island installation, Koppers has built and sold only spray-type saturators to remove ammonia from coke oven gas. Other companies, engaged in saturator construction, have likewise gone over to the spray-type saturator. Commercial success of this type is undoubted.

Otto has granted no licenses under his patent and has brought no other suits for infringement against these defendants or any other companies installing or using the spray-type saturator. Koppers is one of Otto's most active competitors in this field.

Otto claims 1, 2 and 4 and their allowance by the Patent Office have been considered at some length, but further discussion of these and other claims in issue appears necessary. Claim 1 describes the method of continuously producing sulphate of ammonia and the dif-

ferent steps involved in the process. The passing of the gas containing free ammonia into a substantially unobstructed scrubbing space is anticipated by Doherty, Becker, Bosch, Hütte, Jeremiassen and Tiddy. Contacting such gas with saturated ammonium sulphate solution containing free sulphuric acid is found in Jeremiassen and in Underwood's experiments at Bethlehem. Otto withdraws ammonium sulphate liquor to make up such solution from a body of ammonium sulphate liquor in a crystallizing space *below* said scrubbing space, but Otto's preferred form, Fig. 3, would indicate that it need not be *below*. Otto describes the contacting of the gas with the ammonium sulphate solution by spraying such solution into the gas by a whirling motion, and there is no whirling motion of the spray. The spraying by Otto is under such pressure as to disperse such solution in fine spray over substantially the whole cross-sectional area of the space. This was known to the prior art, as shown by Doherty, Becker, Bosh, Hütte and Tiddy.

Claim 2 describes a method as described in claim 1, in which the liquor introduced into the scrubbing space entrains ammonium sulphate crystals. The evidence disclosed that the mother liquor in most commercial saturators prior to Otto contained crystals and whenever this liquor was sprayed, the spray contained crystals.

Claim 4 recites a method as specified in claim 1, in which the acid content of the liquor sprayed into the scrubbing space, adjacent such gas inlet, is about five or six per cent by weight, and in which the acid content of the liquor sprayed into said scrubbing space more remote from said inlet exceeds the first mentioned acid content. These features are mere matters of good engineering.

Claim 5 deals with coarse sprays and fine sprays and their relative positions, but the matter of coarse and fine sprays is a matter of engineering choice. In the Wheeling spray saturator, the finer spray is nearer the outlet, which is just

the reverse of the arrangement described in claim 5.

A comparison of claim 7 with claim 1 discloses much repetition, the elimination, however, of the contacting of the solution with the gas by spraying by whirling motion, and certain additional features. The added features of claim 7 provide for contacting the gas with saturated ammonium sulphate solution containing free sulphuric acid and entraining solid crystalline particles and reacting with the free ammonia to form supersaturated ammonium sulphate liquor, withdrawing supersaturated ammonium sulphate liquor from the scrubbing space and desupersaturating to make up all of said solution used in carrying out the method from a body of ammonium sulphate liquor in a crystallizing space, etc. Another feature is the adding of sulphuric acid to the liquor at a rate so related to the rate at which the ammonia containing gas is passed into said scrubbing space as to effect the reaction of substantially all of the ammonia in the gas with the acid, and make up for the acid combining with ammonia in the scrubbing space.

As to the entrainment of solid crystalline particles in the liquor introduced into the scrubbing space, see the comment above respecting claim 2. The withdrawal of supersaturated ammonium sulphate liquor from the scrubbing space, and desupersaturating the same as described in claim 7, and the rate of adding sulphuric acid to replace the acid lost in combining with the ammonia, were known to the art as shown by Jeremiassen and practiced by Underwood in his Bethlehem modified saturator operations.

Claim 14 covers detailed arrangements of apparatus, but Dr. Otto said in his deposition (p. 79) that none of these details was essential.

Claim 15 adds to claim 14 nothing more than a statement that the gas supply pipe discharges horizontally into the scrubbing space and that a spray is located in this supply pipe. This con-

struction is not found in the Wheeling saturator.

Claim 16 adds to claim 14 a recitation of piping to permit the passage of hot water through the spray nozzles as a cleaning fluid. This was old in the art and noninventive.

Claim 18 merely adds additional piping details to claim 14 and the construction is substantially shown in Jeremiassen.

Claim 19 covers other details of apparatus, piping, etc., which Dr. Otto described in his deposition as nonessential. Also, this claim 19 reads substantially on Jeremiassen's Figure 1 if it should be provided with Spraco nozzles.

In reaching its decision, this Court has considered, in addition to the matters herein discussed at length, other matters mentioned briefly herein or presented at the trial. A few of such considerations are as follows: (1) The presumption of validity arising from the issuance of the patent; (2) commercial success of the spray-type saturator; (3) increased volume of coke oven gas handled by the spray-type saturator and other incidental advantages; (4) outline for lecture course given by Koppers' employees; (5) Koppers' advertising of advantages of spray-type; and (6) the many court decisions cited in the briefs of plaintiff and defendants.

■■■■ The Court's attention was called to a great number of court decisions and, in many instances, the cases would appear to be not free from conflict. However, this Court has endeavored to select and to cite a number of decisions and apply them to the facts of this case. Many cases discuss invention, what constitutes it, and what is not invention. A patent is valid only if it required invention to produce its subject matter. There must be creative originality, resulting in something not available to others in the prior art to which the invention relates. Unless the claims defining a patented invention state substance not known in the prior art, the courts disregard mere verbal

distinctions. Otherwise, any prior art not identical with the claim could be avoided.

■■■ In recent years the courts, under the leadership of the Supreme Court of the United States, have more and more applied the test of whether it required invention to produce the patented subject, in determining validity of a patent. If a patentee merely aggregates old elements and uses knowledge available to all workers in the art, but without any new creative mental originality of the patentee, and without producing any new and different result, such patents are held invalid even though not specifically anticipated by *any one* prior publication or use, and even though the patented subject matter may have material advantages over previously used similar subject matter, and even though outstanding commercial success is enjoyed by the patentee.

U.S.C.A., Title 35, § 103, provides: "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains".

In Powers-Kennedy Contracting Corp. v. Concrete Mixing & Conveying Co., 282 U.S. 175, 186, 51 S.Ct. 95, 99, 75 L.Ed. 278, the Court stated: "For these reasons we find that the patent is invalid. It consists of a combination of elements all of which were old in the art. Its application to the transportation of concrete did not involve invention. Neither the combination of old elements or devices accomplishing no more than an aggregate of old results * * * nor the use of an old apparatus or appliance for a new purpose * * * is invention".

The Fourth Circuit Court of Appeals has repeatedly held patents invalid for lack of invention. In Todd v. Sears, Roe-

buck and Company, 216 F.2d 594, the Court found invalidity for lack of invention. At page 596, that opinion quotes from Great Atlantic & Pacific Tea Company v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162, as follows: " 'Courts should scrutinize combination patent claims with a care proportionate to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly'."

Earlier in the opinion in the Great Atlantic & Pacific Tea Company case, 340 U.S. at page 152, 71 S.Ct. at page 130, the Supreme Court said: "The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable".

In Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 303 U.S. 545, 58 S.Ct. 662, 664, 82 L.Ed. 1008 (cited also in the Todd case), the Supreme Court said: "The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention".

Tropic-Aire, Inc., v. Cullen-Thompson Motor Co., 10 Cir., 107 F.2d 671, 674, holds: "A mere carrying forward of a known principle, or change in form, size, proportions or degree, or doing the same thing in the same way by substantially the same means, with better results, is not in itself invention". This case was also cited with approval in the Todd case, supra.

In Young v. John McShain, Inc., 130 F.2d 31, 32, the Court of Appeals for this circuit said: "We agree with the court below that none of the claims is valid but that all cover mere aggregations of devices, which were old in the art of steel-concrete construction, and which perform in the aggregation merely the functions which they performed in the prior art, without any new effect or resultant from their having been brought together. It is well settled that invention cannot be predicated of such aggregation of old elements even though their bringing together may have resulted in a useful product".

The Court of Appeals for the Fourth Circuit held a patent invalid for lack of invention over prior art that *suggested* what the patent in suit claimed. In Vapor Blast Mfg. Co. v. Pangborn Corporation, 186 F.2d 230, 235, the Court said: "And, particularly apposite, in this connection, are the words of Circuit Judge Soper, speaking for our Court in Remington Rand Business Service, Inc. v. Acme Card System Co., 4 Cir., 71 F.2d 628, 635: 'It is not necessary, however, for the purpose in view, that the Anchell patent be considered a complete anticipation to the patent in suit. It is sufficient that it suggests to one interested in the problem the means of solving it. When we consider the result which Soans was striving to achieve, and note the comparative simplicity of the problem, it is clear that it did not require invention to solve it in view of the suggestions in the kindred art contained in the Rudolph and Anchell patents' ".

W. D. Dodenhoff Co., Inc., v. Gastonia Textile Machinery Co., 4 Cir., 1955, 228 F.2d 539, 540, held a patent invalid for lack of invention over knowledge available in the prior art and suggestive of the patent in suit, and the Court said: "The main question is whether the con-

struction of this apparatus involved invention. We think it does not in view of the prior art".

In examining the Otto application, the Patent Office did not cite certain pertinent prior art. For example, Tiddy patent No. 1,997,757 and Hütte's Handbook were not cited. These additional art references weaken the prima facie validity of the patent. Two decisions of the Court of Appeals of the Fourth Circuit are pertinent on this point. In Maibohm v. RCA Victor Co., 89 F.2d 317, 321, the Court said: "These two patents were not cited in the prosecution of the application for the patent in suit and, while it is true that a patent is prima facie valid, yet when defenses relied upon were not known to or considered by the Patent Office, the presumption of the validity is greatly weakened". In Gillette Safety Razor Co. v. Cliff Weil Cigar Co., Inc., 107 F.2d 105, 107, the same Court said: "Neither of these earlier patents were cited by the Patent Office when the O'Malley application was pending, and since they unquestionably constitute a most important part of the prior art, the presumption of validity arising from the grant of the patent is greatly weakened".

■ The presumption of validity of a patent fails when the prior art before the trial court negatives invention. One of the late cases in which this principle is applied is Metals Disintegrating Company, Inc., v. Reynolds Metals Company, 3 Cir., 1956, 228 F.2d 885. At page 888, the Court said: "The District Court * * * gave no indication of the basis of its conclusion that this patent is valid except to say that the patent 'is entitled to presumption of validity.' However, we think this presumption cannot stand in the face of analysis of Ziehl's claim in relation to the teachings of Hall and the skill reasonably to be expected of a practitioner in applying and adapting the teachings and practices of his art". See also the following decisions of the Court of Appeals for the Fourth Circuit: Bulldog Electric Products Co. v. General Electric Co., 105 F.2d 466; Murdock v. Murdock, 176 F. 2d 434; Vapor Blast Mfg. Co. v. Pangborn Corp., supra; Ingersoll-Rand Co. v. Black & Decker Mfg. Co., 192 F.2d 270.

■ Commercial success of a patented invention, even though outstanding and impressive, is of no effect where a patent is clearly invalid for lack of invention, prior use, anticipation or other defenses. This controlling principle has been consistently applied by the Court of Appeals for the Fourth Circuit in the Bulldog, Murdock, Vapor Blast and Ingersoll-Rand cases hereinbefore cited. In the Vapor Blast case, the Court held invalid a patent in spite of its commercial success. The patent covered a method of cleaning and polishing metal parts by suspending abrasive particles in a carrier liquid, circulating this mixture while keeping the abrasive in suspension in the liquid, and projecting the mixture in jets against the surface to be cleaned or polished. The patent also included claims to the apparatus for practising such a method. The prior art discussed by the Court showed that sand and similar abrasives in a liquid carrier had been used to clean and polish, and that varying types of pumps for such mixtures were known. Prior workers in the art knew that since sand tends to settle out of liquid suspension, the mixture had to be stirred or agitated to maintain a uniform relation of sand and liquid. Various devices for securing that result were known. Upon the basis of such prior knowledge, the patent was held invalid in spite of its utility and wide commercial use.

Apropos of the shift to spray-type saturators due to increased production of coke oven gas during and as a result of the late war, it is interesting to note that the Court said in the Vapor Blast case, 186 F.2d at page 233, "The demand for these wet blast machines appears to have been comparatively small until World War II, when, particularly as to the parts of airplane engines, the demand took a spirited upward jump. It could hardly be said, then, that

the Eppler patent was in any sense revolutionary". In the same opinion, at page 234, the Court said: "The heart of this case is the correctness of the District Court's determination that the claims in suit of the Eppler patent are invalid for lack of invention under the prior art. We think this determination is clearly correct. In reaching this conclusion, we are not unmindful of two points stressed by Vapor's counsel: The presumptions in favor of validity arising from the issuance of the Eppler patent by the Patent Office and the favorable evidentiary value of commercial success of the Eppler machines". This same opinion quotes from Jungersen v. Ostby & Barton Co., 335 U.S. 560, 567, 69 S.Ct. 269, 93 L.Ed. 235, as follows: " 'The fact that this process has enjoyed considerable commercial success, however, does not render the patent valid. It is true that in cases where the question of patentable invention is a close one, such success has weight in tipping the scales of judgment toward patentability. * * * Where, as here, however, invention is plainly lacking, commercial success cannot fill the void'."

In the Ingersoll-Rand case, supra, the Court said, 192 F.2d at page 274: "It is well settled that commercial success does not in itself constitute patentability. Said Mr. Justice Jackson in Great Atlantic & Pacific Tea Company v. Supermarket Equipment Corp., 340 U.S. 147, 153, 71 S.Ct. 127, 95 L.Ed. 162: 'But commercial success without invention will not make patentability' ".

The similarity of the Vapor Blast case, supra, to this spray patent case would seem to be obvious. The "heart of this case" at bar is whether or not Otto exercised invention in spraying mother liquor with entrained ammonium sulphate crystals through coke oven gas in an unobstructed space. The teaching and knowledge of the prior art as shown by the record before this Court clearly negatives invention in so doing.

Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58, found a patent void for lack of patentable invention, although the patented cigarette lighter was new, useful and commercially very successful. At page 90 of 314 U.S., at page 40 of 62 S.Ct. the Court said: "We may concede that the functions performed by Mead's combination were new and useful. But that does not necessarily make the device patentable * * * the device must not only be 'new and useful', it must also be an 'invention' or 'discovery'. * * * [I]t has been recognized that if an improvement is to obtain the privileged position of a patent more ingenuity must be involved than the work of a mechanic skilled in the art". At page 91 of 314 U.S., at page 41 of 62 S.Ct. of the same opinion, the Court states that the patent there in suit was invalid because and although the patentee "merely incorporated the well-known thermostat into the old 'wireless' lighter to produce a more efficient, useful and convenient article". At page 92 of 314 U.S., at page 41 of 62 S.Ct. of the same opinion, the Court held that the test of invention must be applied by the courts because "strict application of that test is necessary lest in the constant demand for new appliances the heavy hand of tribute be laid on each slight technological advance in an art".

In Interstate Rubber Products Corp. v. Radiator Specialty Co., Inc., 4 Cir., 214 F.2d 546, 548, the Court said: "The touchstone is whether the new thing is beyond the ability of the worker of ordinary skill in the field, and neither the courts nor Congress have been able to offer a more definite test, so that in the end it must be left to the judgment of the courts in controverted cases to apply the formula to the specific facts; and the judges may not endow with the quality of invention every new and useful advance amidst the myriad activities of a resourceful people".

The same court in Pearson Sanding Mach. Co. v. Williams Furniture Co., 132 F.2d 55, 58, stated: " 'A mere carrying forward of a known principle, or change in form, size, proportions or degree, or doing the same thing in the same way

by substantially the same means, with better results, is not in itself invention'". In the same opinion, the Court quoted with approval a statement by the Court of Appeals of the Second Circuit, Hobart Mfg. Co. v. Landers, Frary & Clark, 26 F.Supp. 198, as follows: "'A mere difference or change in the mechanical construction in size or form of the thing used, in order to obviate known defects existing in the previous devices, although those changes are highly advantageous, and far better and more efficacious and convenient, does not make the improved device patentable'."

 If this Court should hold valid the spray patent in suit, the effect would be to give Otto the exclusive right to remove ammonia from coke oven gas by spraying mother liquor through the coke oven gas in an unobstructed space because Otto has stated that as the crux and essence of his invention. This, the Court cannot find. Consequently, the claims upon which the plaintiff relies in this suit, both method and apparatus, must be held invalid for lack of invention.

In view of this finding of invalidity, it would seem unnecessary to consider the question of infringement. However, the Court is of the opinion that if a finding of validity be based on the removal of ammonia from coke oven gas by spraying mother liquor through the coke oven gas in an unobstructed space, as called for by the Otto patent, then the spray saturators installed by Koppers for Wheeling in 1952 do infringe the Otto patent.

Formal findings of fact and conclusions of law as to patent No. 2,599,067 are as follows:

### Findings of Fact

1. The two spray-type saturators alleged in this suit to infringe the Otto spray patent were designed and installed in 1952 by defendant Koppers, and have since been used by defendant Wheeling at Follansbee, West Virginia, in this judicial district.

2. This patent in suit describes and claims five different forms of saturators for removing ammonia from coke oven gas. Of these five forms, only one installation as shown in Fig. 1 of the patent has been built by Otto. No saturators of the forms shown in Figs. 2 and 5 have been built. All the other saturators built by Otto under this patent have been as shown in Figs. 3 and 4, although Otto's saturators as successively installed have progressively varied in improved detail.

3. The essential feature of this Otto patent is spraying "mother liquor" containing crystals of ammonium sulphate, to which sulphuric acid has been added, through nozzles into an unobstructed scrubbing space through which coke oven gas is continuously passed.

4. "Mother liquor", drawn from a normal crystallizing pool, inevitably contains small crystals of ammonium sulphate. This has been true of all prior art saturators.

5. In the methods of spraying "mother liquor" through coke oven gas described or used prior to 1946, the liquor sprayed was obtained by drawing part or all of it from a mother liquor pool.

6. Prior art here of record shows that "mother liquor" containing ammonium sulphate crystals had been disclosed and used to remove ammonia from coke oven gas by spraying it in finely divided form through coke oven gas in unobstructed spaces.

7. Chemical engineers well knew prior to 1946 that effective contact of a liquid and a gas, for producing chemical reaction, absorption, or cooling, could be obtained by spraying the liquid through the gas in an unobstructed scrubbing space.

8. Chemical engineers well knew before 1946 that effective surface contact of a liquid and gas could be brought about by passing the liquid through the gas in the form of a spray, shower or mist.

9. It was well known before 1946 that the finer the droplets of liquid pass-

590

ing through a gas, the greater the surface contact produced by any given amount of liquid, and consequently the more effective and rapid was the chemical reaction of the gas and the liquid constituents.

10. In the crackerpipe type of saturators used before 1946, coke oven gas was forced under pressure into a pool of mother liquor and passed through the pool in the form of gas bubbles, thus obtaining surface contact of gas and liquid.

11. The crackerpipe type of saturators in use for many years effectively removed the ammonia from coke oven gas.

12. No new or different chemical reaction results from the use of Otto's spray-type saturator and none is claimed.

13. The spray nozzles described in and claimed as essential elements in this patent were not invented, designed or modified in any way by Otto. He found them ready made, on sale to the public as "Spraco Nozzles", in conventional forms, adapted to produce either coarse or fine sprays. Such nozzles are described by U. S. Patent No. 1,101,264 to Eneas, issued in 1914.

14. Defendant Koppers had used Spraco nozzles such as those specified in the Otto patent in suit as early as 1926.

15. By Otto's own admissions, the spray nozzles, tar remover, acid catcher, crystallizing basin, means for controlling the size of ammonium sulphate crystals, means for continuously supplying additional sulphuric acid, means for recirculation of "mother liquor" from the crystallizing basin to the scrubbing chamber, etc., were not original with him and were known and used in commercial saturators before 1946.

16. By Otto's own admissions, it was a matter of engineering to design an apparatus for carrying out his process of removing ammonia from coke oven gas by spraying mother liquor through the gas.

17. Some of the most pertinent prior art now before the Court was not cited by the Patent Office. (See written opinion.)

18. In 1942 the Bethlehem Steel Company, at Bethlehem, Pennsylvania, (through Underwood, its employee), modified four of its five existing crackerpipe saturators by putting in perforated "spray-pipes" above the surface of the mother liquor pool in the saturators. Mother liquor containing entrained crystals was forced through holes in the spray pipes, and the streams of liquor so produced were distributed by splash plates to cause the liquor in finely divided form to pass through the coke oven gas in the unobstructed space above the pool, and thereby removed some of the ammonia.

19. The installation of the Bethlehem spray pipes was expensive, required several weeks of work of installation for each saturator. Two old crackerpipe saturators were first so equipped and put in operation. Later, two other saturators were similarly equipped and put into operation. From sometime in 1942 until 1944, the coke oven gas produced at that Bethlehem plant was treated in these combined crackerpipe and spray saturators to remove the ammonia. While these installations did not operate too satisfactorily, they were used commercially during that period.

20. The splash type of liquid distribution used at Bethlehem for projecting liquid through gas was an old, well-known and effective apparatus for producing sprays. Splash type sprays had been used in commercial saturator installations of Koppers prior to 1943.

21. The Patent Office was misled by arguments that Otto's contacting the gas and liquid was effected by spraying the liquid with a "whirling motion". Some of the claims in suit were allowed because of inclusion of that element. There is no such thing as a "whirling spray" in the sense that term was used in arguments to the Patent Office, and in the sense that such term is used in the claims in suit.

22. The two Wheeling saturators, installed by Koppers in 1952, use Spraco

s

nozzles for spraying the liquid into the coke oven gas in an unobstructed space.

23. Other companies erect saturators of this spray type construction and use the method substantially as Otto describes in his patent.

24. Otto has no licensees under his patent and this is the first suit by him charging infringement by anyone.

### Conclusions of Law

1. The spray patent in suit is owned by Carl Otto, the plaintiff-patentee.

2. The charge of infringement is limited to the saturators now owned and operated by defendant Wheeling, at Follansbee, West Virginia, in this judicial district.

3. There was no invention by Otto in designing in 1946 a saturator for, or using the method of, removing ammonia from coke oven gas by spraying "mother liquor", containing entrained ammonium sulphate crystals to which sulphuric acid has been added, through coke oven gas in an unobstructed space to cause sulphuric acid and ammonia to combine to form ammonium sulphate crystals.

4. There was no invention by Otto involved in 1946 in removing ammonia from coke oven gas by the method of, or apparatus for, spraying sulphuric acid solution through conventional nozzles, with or without entrained ammonium sulphate crystals, into an unobstructed space through which coke oven gas passes.

5. The basis of plaintiff's invention, as asserted in this case, is dependent on novelty and originality with Otto of the methods and apparatus stated in conclusions 3 and 4 above.

6. Claims 1, 2, 4, 7, 8, 14, 15, 16, 18 and 19 of Otto patent No. 2,599,067 are invalid for lack of invention.

7. The prima facie presumption of validity of a patent, arising from the grant by the Patent Office, is rebuttable, and in this case has been destroyed by the evidence before this Court, in so far as the numbered claims in suit are concerned.

8. There can be no infringement of an invalid patent; therefore, the claims in suit as above numbered of Otto patent No. 2,599,067 have not been infringed by the defendants by the manufacture or use of the Wheeling saturators at Follansbee, West Virginia.

9. Defendants' counterclaim for a judgment of invalidity and noninfringement of the claims in suit of the spray patent is well founded in law, on the basis of the facts established in this record; and the judgment prayed is proper and will be ordered.

10. The complaint as to patent No. 2,599,067 must be dismissed, with costs awarded to defendants.